515 So.2d 34 (1986)
Pernell FORD, alias
v.
STATE.
7 Div. 327.
Court of Criminal Appeals of Alabama.
February 25, 1986.
Rehearing Denied March 25, 1986.
*35 Merrill Vardaman and John Thomason, Anniston, for appellant.
Charles A. Graddick, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.
BOWEN, Presiding Judge.
In 1984, Pernell Ford was indicted and convicted for the capital murders of Linda Gail Griffith and Willie C. Griffith, committed during the course of a burglary, a violation of § 13A-5-40(a)(4), Code of Alabama 1975. Sentence was death by electrocution.
The trial court's findings of fact from the guilt phase of the trial are:
"That on December 2, 1983, at approximately 7:15 p.m. the bodies of Willie C. Griffith and her daughter Linda Gail Griffith were found in their residence at 417 Goodlett Street, Jacksonville, Calhoun County, Alabama. The bodies were discovered by one Odell McGinnis, a family friend of the victims. The discovery of the victims' bodies was reported to the Jacksonville Police Department and an investigation was immediately commenced by the said Jacksonville Police Department, the Office of the District Attorney of the Seventh Judicial Circuit, the Alabama Bureau of Investigation, the Department of Forensic Sciences of the State of Alabama and the Office of the Coroner of Calhoun County, Alabama. It was determined that night that the victims each apparently died from multiple stab wounds to the head, neck and trunk, that the house showed signs of a physical struggle and that certain items of personal property belonging to the victims were missing. Among the personal property missing from the premises was one 1978 Chevrolet Caprice automobile, tan in color, bearing Alabama license plate 11B-9461 and bearing vehicle identification number 1N69V83273152.
"On the following day, Saturday, December 3, 1983, at approximately 12:30 p.m., Illinois State Troopers, Steve Gregurich and Loren Cowdrey, had the occasion to encounter the above described automobile while the same was being operated by the Defendant, Pernell Ford, on Interstate 55 at or near Springfield, Sangamon County, Illinois. Said troopers' attention was directed toward said automobile as a result of the same being operated at approximately 73 miles per hour on a highway with a maximum posted speed limit of 55 miles per hour. The automobile was stopped by said troopers for speeding.
"Upon investigation, it was determined that the driver of the subject automobile was unable to produce a valid driver's or operator's license. Upon further investigation it was determined that the Defendant gave the said officers a false name, namely Jessie Willie Griffith, and that he was in the possession of numerous credit cards belonging to Linda Gail Griffith, one of the *36 victims. The investigation further produced the discovery of a loaded 38 caliber pistol being transported in said automobile by the Defendant and this, combined with the Defendant's inability to produce a valid operator's license for the vehicle he was driving, resulted in the custodial arrest of the Defendant.
"Subsequent to the Defendant being transported to the headquarters office of District 9 of the Illinois State Troopers in Springfield, Illinois, the troopers' investigation further produced the discovery of credit cards and other identification type documents issued to Linda Gail Griffith and Willie C. Griffith in the possession of the Defendant. A telephone call made at the request of the investigating officers to the residence of Linda Gail Griffith and Willie C. Griffith in Jacksonville, Alabama, disclosed that said victims had been found apparently murdered on the night before. This precipitated a full felony investigation on behalf of the Illinois State Police.
"The investigation by the Illinois State Police determined that the Defendant was in the possession of numerous items of personal property belonging to Linda Gail Griffith and Willie C. Griffith, that the automobile he was operating likewise contained numerous items of personal property belonging to said victims, that the automobile contained a cardboard box which bore what appeared to be a sharp instrument cut or stab type hole around which a reddish brown substance appeared, that a glove with a reddish brown stain on it was found, that certain articles of clothing which appeared to have been recently purchased and in new condition were also found.
"A fugitive charge was placed against the Defendant, a major felony case investigation was commenced wherein the Defendant's clothing was seized and secured, fingernail scrapings were had, the Defendant was fingerprinted and the automobile was fully processed by a crime scene technician and the items contained within it were seized and secured.
"The Defendant waived extradition to the state of Alabama and Chief Paul Locke of the Jacksonville Police Department and Investigator Charles Winfrey of the Office of the District Attorney of the Seventh Judicial Circuit accepted custody of the Defendant, the victim's automobile and all items of evidence found in the possession of the Defendant at the time of his arrest. The Defendant was returned to the State of Alabama as was the evidence and property seized.
"At trial, evidence and testimony was produced to the effect, and the Court specifically finds, that the victims in this case, Willie C. Griffith and Linda Gail Griffith, were the victims of a homicide and that the death of each of said victims was caused by multiple stab wounds to the head and body. The Court further finds that the preponderance of the wounds inflicted on both victims were apparently inflicted from the back, and laboratory tests disclosed that both victims had blood types of a similar nature.
"From the evidence and the testimony presented at trial, the Court further finds that the Defendant's blood type was not consistent with the blood groupings of the victims. The Court finds further that the blood sample of the Defendant was obtained by law enforcement officers by consent, that the same was properly handled and that the same was properly analyzed by laboratory experts of the Department of Forensic Sciences.
"The Court further finds from evidence and testimony presented at trial that a fingerprint of the Defendant was found upon the glove box of the automobile discovered in his possession in Springfield, Illinois, and that the glove box contained a 38 caliber pistol which was later identified as being the property of the victim, Linda Gail Griffith. The Court further finds that numerous items of personal property discovered in said automobile, including, several credit cards, identification cards, purses, photographs, a gold necklace, a coupon file, a key ring containing keys and other items were identified as belonging to the victims and missing from their home. The cardboard box found in said automobile at the time of the Defendant's arrest was *37 found to contain or have upon it tracings of blood compatible with the blood types and subgroupings of the victims and not compatible with the blood type and subgroupings of the Defendant's blood.
"From evidence and testimony produced at trial, the Court further finds that an examination of the Defendant's clothing produced the discovery of blood stains or residue on the shoes, socks, pants and shirt of the Defendant. The lab tests conducted by qualified experts on those blood samples disclosed that the traces of blood on the Defendant's shoes, socks and shirt were human blood of indeterminable type and that the blood stains found on the pants were human blood of a type and subgroup or subgrouping consistent with the blood of the victims and inconsistent with the blood of the Defendant.
"From the evidence and testimony the Court further finds that the glove found in the automobile in the possession of the Defendant on December 3, 1983, in Springfield, Illinois, bore upon it a stain which was later determined by laboratory experts of the Department of Forensic Sciences to be human blood of a type consistent with the blood of the victims and not consistent with the blood of the Defendant. It was further shown by competent evidence and testimony, and the Court finds, that upon said glove was also found a human hair consistent with the hair of the victim, Linda Gail Griffith, and fibers consistent with fibers comprising the clothing worn by the victim, Linda Gail Griffith, at the time of her death.
"The Court further finds from the evidence and testimony that on December 10, 1983, the Defendant, after full and complete explanation of his constitutional rights and with a full and complete voluntary, intelligent and knowing waiver of the same, gave to Chief Paul Locke and Officer Kyle Sanders an inculpatory statement. From the evidence and testimony, specifically through the testimony of Chief Paul Locke, the Court finds that said statement, in substance, disclosed that the Defendant admitted entering into the residence of the victims without consent for the purpose of committing a theft therein, that he was discovered by the victims, that the victim, Linda Gail Griffith, attempted to prevent his escape and that he stabbed her, that the victim, Willie C. Griffith, was `raising so much Cain' that he killed her and that he stole numerous items of personal property within the house, one of the items being the pistol found in the automobile, and that he fled the scene in the 1978 Caprice Chevrolet automobile in which he was stopped in Springfield, Illinois.
"The Court, based upon the evidence and testimony and the Defendant's inculpatory statement, finds that the Defendant, Pernell Ford, intentionally caused the death of the victim, Willie C. Griffith, and the death of the victim, Linda Gail Griffith, during a Burglary in the First Degree or Burglary in the Second Degree or an attempt thereof committed by the Defendant as defined in § 13A-5-40(a)(4). While the Indictment in this case charges the Defendant with a violation of § 13A-5-40(a)(4) in four separate counts, each count charges the Defendant with the commission of a capital offense charged in said section. The Court is of the opinion that the charges stated against the Defendant in each of the respective counts (namely Counts III, IV, V and VI of the Indictment) are not mutually exclusive and the Court is of the opinion that the Jury properly found, from the evidence and testimony, that the Defendant was guilty of the charge contained in each of said counts in the indictment."

I
Prior to trial, the defendant's three appointed attorneys informed the court that the defendant wished to discharge his lawyer and proceed with the trial pro se. In open court with all parties present, the trial judge ascertained that the defendant did, in fact, desire to represent himself, that he was nineteen years old, that he had a ninth grade education, and that he had no significant work history.
Thereupon, the trial judge conducted an extensive colloquy with the defendant in which he explained to the defendant the rights he would be relinquishing by representing *38 himself and outlined the sequence of events the defendant could anticipate in the trial of his case. As noted by the State, Appellee's brief, pp. 5-10, the trial court informed the defendant of the following:
"(a) that he had a constitutional right to be represented by counsel;
"(b) that three experienced attorneys had been appointed to represent him at no cost to him;
"(c) that self-representation was a foolhardy endeavor and that the trial court was advising him against this course;
"(d) that a criminal trial is a very complicated matter even for an accomplished trial attorney;
"(e) that his attorneys had a duty to represent him to the best of their capacity and to make sure that he received a fair trial;
"(f) that his trial would begin with the selection of a jury; that an attorney has experience in jury selection; and that an inexperienced layman such as himself would be at a disadvantage in conducting this alone;
"(g) that the trial court would not be there to represent him;
"(h) that after the jury selection each side would make an opening statement; that an attorney would know how to make such a statement so as to represent the defendant's case in the most favorable manner; and that an inexperienced layman such as himself would be at a disadvantage giving an opening statement alone;
"(i) that the next stage of the trial would be the presentation of the state's case through witnesses; that an attorney would know when evidence was objectionable; and that an inexperienced layman such as himself would be ill-equipped to do this;
"(j) that during the course of a trial many motions would be made; that an attorney would know when and how to make such motions; and that an inexperienced layman such as himself would be disadvantaged in proceeding alone;
"(k) that when the State has presented its evidence, numerous motions could be made at this point by a defendant's attorneys; that an attorney would know what motions to make and how to make them; and that an inexperienced layman would not know what motions to make;

"(l) that a defendant would then have the opportunity to present his own defense; that an attorney would be helpful in determining which witnesses to call and which questions to ask; and that without an attorney he would be at a distinct disadvantage;
"(m) that after a defendant had finished calling on his witnesses, other motions could be made; that without an attorney he would not know which motions to make;
"(n) that after a defendant had presented his case the state can present additional evidence; and that an inexperienced layman such as himself would not know what objections to make to this evidence;

"(o) that after both sides had presented their evidence additional motions could be made; and that without an attorney he would not know what those motions were;
"(p) that after these motions were made, each side could ask the court to give certain jury charges which would be favorable to it; and that an inexperienced layman such as himself would not know enough about the law to select appropriate jury charges;
"(q) that each side would then give a closing argument to the jury to persuade the jury to vote its way; that this stage of the trial really tests an attorney's skills as an advocate; that a defendant's attorney would try to persuade the jury that the defendant is not guilty or is guilty of a lesser included offense; and that an inexperienced layman such as himself would be ill-equipped to argue to the jury;
"(r) that after the jury retires other motions could have to be made which a layman would not know about;

*39 "(s) that if he were to be found guilty, then a second trial would be held to determine whether he would be punished by life without parole or death; that a defendant at this stage would need all of the legal expertise available; and that an inexperienced layman such as himself would be ill-equipped to handle this stage;
"(t) that after the jury returned a verdict on sentence a sentence hearing would be held before the trial judge; and that without legal counsel he would be ill-equipped to handle this portion of the trial;
"(u) that the defendant had the right to be present at all times, the right to cross-examine all witnesses for the state, the right to subpoena witnesses in his behalf, and the right to present defenses and make motions and objections;
"(v) that he would be presumed innocent until proven guilty beyond a reasonable doubt;
"(w) that among the defenses available to him was the defense of not guilty by reason of insanity; that the defendant has the burden of proving this defense; and that his lawyers would be able to do a much better job than he of presenting this defense;
"(x) that the trial court would not be representing him in the trial, and that it would be the job of the prosecutor to prove him guilty beyond a reasonable doubt;
"(y) that he might waive objections on appeal by failing to raise them at trial;
"(z) that by representing himself he would be waiving the issue of ineffective assistance of counsel on appeal."
At each step of the trial court's explanation the defendant acknowledged that he understood what the court was telling him and stated that he had no questions. When the trial judge inquired of the defendant why he wished to represent himself, the defendant stated: "Well, I feel like I'm competent enough toto represent myself. You know, I have been to Bryce's and I was found not insane, so I feel like I'm able to do it.... I'm the one facing trial; I should be able to represent myself." When asked if he thought he could do a better job of representing himself than his attorneys, the defendant said "Yeah." The trial court then heard testimony from three mental health professionals regarding the defendant's competence to waive his right to counsel.
Dr. Robert G. Summerlin, a psychologist hired at the request of the defense team, testified that he interviewed the defendant in jail for two hours, during which time he administered five tests to the accused. He found that the defendant had an I.Q. of 80, and was competent to stand trial, but he had "some serious questions" about the defendant's mental ability to waive his right to counsel. Summerlin stated that the defendant had the capacity to understand everything the trial judge explained to him, but said that the defendant may have already made up his mind to proceed pro se and may not have been listening to the judge. He gave his opinion that the defendant had a personality disorder with some indication of "emerging psychosis." His diagnosis was based upon the Minnesota Multiphasic Personality Inventory (M.M. P.I.), and he had reason to doubt the validity of the defendant's scores on that test. He acknowledged that both his diagnosis of the defendant and his doubts about the defendant's competency to waive his right to counsel could be affected by the possibility of the defendant's "malingering" or "faking bad."
Dr. Wallace W. Wilkerson, a psychiatrist whom the trial judge asked to evaluate the defendant, testified that in his opinion the defendant was "far more intelligent" than an I.Q. of 80 would indicate, and estimated the defendant's I.Q. to be closer to 110. Dr. Wilkerson found no evidence of emerging psychosis and stated that the defendant was a sociopath, one who believes the law does not apply to him. He told the court that the defendant "knows the system. And he's perfectly capable of knowing what to do to beat the system or confuse the system." Wilkerson concluded that the defendant was competent to stand trial, *40 competent to waive his right to an attorney, and had been feigning mental illness.
Dr. Harry A. McClaren, chief psychologist at the Taylor Hardin Secure Medical Facility in Tuscaloosa, testified that he interviewed the defendant earlier in Tuscaloosa and later on the day of the competency hearing. In his opinion, the defendant had an anti-social personality disorder, was competent to stand trial, and was competent to make the choice to dismiss his legal counsel.
The trial court determined that the defendant was competent to stand trial and was fully capable of knowingly and intelligently choosing to represent himself. He granted the defendant's request to proceed pro se but informed the defendant that his attorneys would be required to remain on "standby" in the courtroom throughout the trial and would be available to consult with him or to take over his representation should he change his mind about appearing pro se.
During the trial, the defendant made no opening statement, no objections or motions, and did not present a defense. He tendered no requested jury charges and did not object to the court's oral charge. He did make a closing argument to the jury. Later, during the sentencing phase of the trial, he allowed his appointed attorneys to assist him. Defense counsel introduced various medical and psychological records of the defendant and made a closing argument to the court during the sentencing hearing.
The defendant now argues that he was denied the effective assistance of counsel; first, because there should be no right to waive counsel in a capital case; second, because he was incompetent to waive his right to an attorney; and, third, because his standby counsel did not sit at the defense table with him.

A.
The defendant's first argument has no legal support. The accused has a constitutional right to self-representation, Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and that right is applicable in capital cases, see Goode v. Wainwright, 704 F.2d 593, 598 (11th Cir.), rev'd on other grounds, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983); People v. Teron, 23 Cal.3d 103, 588 P.2d 773, 151 Cal.Rptr. 633, (1979); Smith v. State, 407 So.2d 894 (Fla.1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982); Goode v. State, 365 So.2d 381 (Fla.1978), cert. denied, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979); Bishop v. State, 95 Nev. 511, 597 P.2d 273 (1979); Commonwealth v. Davis, 479 Pa. 274, 388 A.2d 324 (1978).

B.
We also reject the defendant's contention that he was not competent to waive his right to counsel and conduct his own defense. In articulating a defendant's constitutional right to proceed without the assistance of a lawyer, the Faretta court observed the following:
"When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must `knowingly and intelligently' forgo those relinquished benefits. Johnson v. Zerbst, 304 U.S. [458] at 464-465 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461]. Cf. Von Moltke v. Gillies, 332 U.S. 708, 723-724 [68 S.Ct. 316, 323, 92 L.Ed. 309] (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that `he knows what he is doing and his choice is made with eyes open.' Adams v. United States ex rel. McCann, 317 U.S. [269] at 279 [63 S.Ct. 236, 242, 87 L.Ed. 268]."
Faretta v. California, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d 562. The record before us demonstrates that the defendant was thoroughly apprised of the dangers, disadvantages, and consequences of proceeding *41 without counsel. In fact, we cannot envision a more diligent effort on the part of a trial judge, first, to inform the accused of his rights and the order of trial, second, to enlighten him as to the pitfalls of going to trial unaided by an attorney, and third, to dissuade him from undertaking his own representation.
The fact that the defendant made no objections or motions, presented no defense, or otherwise participated in a "lawyer-like" capacity at trial does not lead to the conclusion that he was mentally incapable of waiving his right to counsel. The defendant's legal expertise was irrelevant. See Faretta v. California, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d 562; Curry v. Superior Court, 75 Cal.App.3d 221, 226, 141 Cal.Rptr. 884, 887 (1977). "[A]lthough [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of `that respect for the individual which is the lifeblood of the law.'" Faretta v. California, 422 U.S. at 834, 95 S.Ct. at 2541, 45 L.Ed.2d 562, (quoting Illinois v. Allen, 397 U.S. 337, 350-51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)). As the California court observed in Curry v. Superior Court, supra, "[T]he sole issue to be determined in a Faretta hearing is whether the defendant has the mental capacity to waive his constitutional right to counsel with a realization of the probable risks and consequences of his action." 75 Cal.App.3d at 226-27, 141 Cal.Rptr. at 887. In sum, we believe that the risks inherent in self-representation were fully outlined for the defendant. The only remaining issue is whether, based "upon the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused," Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) this defendant had the mental capacity to comprehend the implications of waiving his right to counsel, or as the United States Supreme Court phrased the question: the determination is whether the defendant "knows what he is doing and his choice is made with eyes open." Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942).
The defendant argues that his mental status (including a history of emotional problems, and an I.Q. of 80), his age (nineteen years), and his lack of formal education (ninth grade) rendered him incapable of intelligently waiving his right to counsel.
"A defendant who waives the assistance of counsel in a criminal trial is by that very act doing something that calls into question his rationality, and the United States Supreme Court has indicated that greater care must be taken in allowing a person to waive his right to an attorney than it does in finding him competent to stand trial." State v. Decello, 111 Ariz. 46, 48-49, 523 P.2d 74, 76-77 (1974) (citing Westbrook v. Arizona, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966)). See also Coleman v. State, 617 P.2d 243 (Okla.Cr.App.1980). In Westbrook v. Arizona, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966), the Supreme Court implied that there is a distinction between the test for competence to stand trial and the test for competence to make a knowing and intelligent waiver of the right to counsel, with the latter standard being more stringent. Some of the lower federal courts have construed Westbrook to require a "vaguely higher" criterion for competence to waive counsel than for competence to stand trial, see e.g., United States ex rel. Konigsberg v. Vincent, 526 F.2d 131, 133 (2d Cir.1975), cert. denied, 426 U.S. 937, 96 S.Ct. 2652, 49 L.Ed.2d 388 (1976), and commentators have suggested that the trial court must first determine that the accused is competent to stand trial, and then must inquire whether he is mentally capable of choosing to dispense with a lawyer's help. See Silten and Tullis, Mental Competency in Criminal Proceedings, 28 Hastings L.J. 1053, 1066 (1977).
The defendant will pass the second test if he is "free of mental disorder which would so impair his free will that his decision to waive counsel would not be voluntary." Id. at 1067. The California courts have concluded that the waiver standard set out in Johnson v. Zerbst, 304 U.S. 458, 464, 58 *42 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), i.e., the "intentional relinquishment or abandonment of a known right or privilege," is satisfied if the trial court finds that the defendant is free of mental disorder and is aware of the consequences of his insistence upon representing himself. Curry v. Superior Court, 75 Cal.App.3d at 228, 141 Cal.Rptr. at 888-89.
The record in this case leaves no doubt that the defendant was free of a mental disorder which would so impair his will as to render his waiver decision involuntary. First, all three experts who testified at the competency hearing unequivocally stated that the defendant was competent to stand trial. Furthermore, two of the experts were equally positive in their diagnoses that the defendant was free of mental disease and competent to waive counsel. Moreover, even Dr. Summerlin, the one expert who expressed some doubt about the defendant's mental ability to waive counsel, was unwilling to characterize the defendant's condition as anything more than indicative of "emerging psychosis" and he acknowledged that his findings could have been colored by the defendant's "faking bad."
In light of the tentativeness of Dr. Summerlin's conclusions, and the testimony by Dr. Wilkerson that the defendant knew how to "beat" or "confuse" the system, the trial judge was warranted in making his determination that the defendant did not suffer from any mental disease which would impair the intelligence and voluntariness of his waiver of counsel. Compare Wilks v. Israel, 478 F.Supp. 404, 408-09 (E.D.Wis.1979), aff'd, 627 F.2d 32 (7th Cir. 1980), cert. denied, 449 U.S. 1086, 101 S.Ct. 874, 66 L.Ed.2d 811 (1981) (defendant who had been hospitalized in a mental institution five times for observation and treatment found competent to waive counsel in view of medical testimony that his behavior was "goal-directed and manipulative").
Similarly, the lower court's finding that the defendant was intelligent enough to understand the consequences of his decision to dismiss counsel was not undermined by testimony that the defendant had a tested I.Q. of 80, especially in view of contradictory testimony that the defendant may well have had a much higher I.Q. of 110. While some courts have found a defendant with a subnormal I.Q. incompetent to waive counsel, cf. Ex parte King, 550 S.W.2d 691 (Tex.Cr.App.1977) (defendant had an I.Q. of 80 and was also illiterate), others have held that an I.Q. in the mentally retarded range does not, standing alone, mandate a finding that the defendant was unable to waive counsel, see State v. Armstrong, 332 S.E. 2d 837 (W.Va.1985). Following the Supreme Court's mandate that the waiver question depends "upon the particular facts and circumstances surrounding [each] case, including the background, experience and conduct of the accused," Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), we find that the record contains substantial evidence that the defendant understood the risks he was undertaking by representing himself. In our judgment, the following testimony by Dr. McClaren is indicative of the defendant's capacity for rational thought:
"Q [BY ASSISTANT DISTRICT ATTORNEY]: Based upon your communications with Mr. Ford this morning do you feel like Mr. Ford understands the ramifications of that particular request and is he competent, in your opinion, to make that request?
"A [BY DR. McCLAREN]: While I don't understand myself all the legal ramifications, all the possible legal ramifications of waiving your right to counsel, Mr. Ford understood that heor told me that he understood that he was not trained in the law and realized that he was at risk to make technical, legal mistakes. Yet, he persisted in saying that he felt that his two likely outcomes of these proceedings were either death by electrocution or life without parole in the penitentiary. Given those two possibilities he didn't see how he could hurt his case by acting as his own attorney.
"Q And given that particular answer do you determine that as being indicative of any mental problem that the Defendant might have been suffering?
"A In my opinion it did not.

*43 "Q All right. Can you tell us any reason why the Defendant is not capable of going to trial next week?
"A No; I can't."
Given other evidence of the defendant's mental capacity to waive his right to counsel, his relative youth (age nineteen) was not sufficient in itself to render his decision involuntary. See Commonwealth v. Davis, supra (defendant in capital case was nineteen). Compare State v. Rogers, 208 Neb. 464, 303 N.W.2d 788 (1981) (seventy-two year old defendant suffering some organic brain damage due to acute alcoholism and termed "cantankerous" by the trial court found competent to waive counsel).
Finally, the defendant's lack of formal education was even less a barrier to a finding of an intelligent waiver of counsel in this case than it might have been in other reported opinions. See People v. Teron, 23 Cal.3d 103, 588 P.2d 773, 151 Cal. Rptr. 633 (1979) (defendant in a capital case had a tenth grade education); People v. Torres, 133 Cal.App.3d 265, 184 Cal.Rptr. 39 (1982) (defendant had tenth grade education). The record here contains the unanimous opinion of three experts that the defendant had no trouble comprehending the trial court's explanation of the advantages he would forgo by representing himself.
A trial court's decision following a Faretta hearing is reviewed for abuse of discretion. State v. Hartford, 130 Ariz. 422, 636 P.2d 1204 (1981), cert. denied, 456 U.S. 933, 102 S.Ct. 1987, 72 L.Ed.2d 452 (1982); People v. Teron, supra; Curry v. Superior Court, supra. In the case before us, the psychological evidence, the trial court's thorough colloquy with the defendant, and the defendant's responses fully support the court's finding that this defendant had the capacity to waive counsel. We find that the court exercised its discretion properly, and its order is upheld on appeal.

C.
The defendant had no constitutional right to have standby counsel sit at the defense table with him because the defendant had no right to the appointment of standby counsel.
We have been cited to no authority holding that the appointment of standby counsel to aid an accused who has elected to represent himself is required. Such a proposal is found in Comment, Mandatory Advisory Counsel for Pro Se Defendants: Maintaining Fairness in the Criminal Trial, 72 California L.Rev. 697 (1984). However, even California has not adopted that proposal for mandatory standby counsel. A more compelling argument has been made that the accused must be allowed to represent himself even in the trial of a death case. Comment, The Right of Self-Representation In The Capital Case, 85 Columbia L.Rev. 130 (1985). To date, no court, including any in California, has adopted the California proposal. Annot., 98 A.L.R.3d 13 (1980).
Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), recognizes that an accused has a Sixth Amendment right to conduct his own defense in a criminal trial. McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), held that a trial court may appoint standby counsel to aid a pro se defendant in an advisory capacity. Neither Faretta nor Wiggins requires the appointment of standby counsel. Both Faretta and Wiggins recognized that the appointment of counsel for an accused who has elected to represent himself may violate the accused's Sixth Amendment rights.
A pro se defendant "has no absolute right to either hybrid representation or to advisory counsel." Project: Fourteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1983-84, 73 Geo.L.J. 249, 601-02 (1984). "Criminal defendants have no constitutional right to both self-representation and the assistance of counsel. United States v. Halbert, 640 F.2d 1000, 1009 (9th Cir.1981); United States v. Trapnell, 638 F.2d 1016, 1027 (7th Cir.1980)." United States v. Weisz, 718 F.2d 413, 426, n. 72 (D.C.Cir.1983), cert. denied, 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984) (emphasis in original). In United States v. *44 Anderson, 716 F.2d 446 (7th Cir.1983), the defendant sought to alternate the conduct of his defense with his attorney by cross-examining some witnesses himself and leaving the bulk of the remainder of the proceedings to his attorney. The Court held, "this court has squarely held that such `hybrid' representation as defendant proposed here is not an option secured by the Sixth Amendment. [Citing Trapnell, supra]." Anderson, 716 F.2d at 449. See also Raulerson v. Wainwright, 732 F.2d 803, 809 (11th Cir.1984), cert. denied, 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 ("A defendant may waive his right of self-representation by electing to act as co-counsel."); Smith v. State, 150 Ga.App. 498, 258 S.E.2d 167 (1979).
In United States v. Mills, 704 F.2d 1553 (11th Cir.1983), cert. denied, 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984), our own United States Court of Appeals for the Eleventh Circuit recognized that "the right to appointed counsel and the right to proceed pro se exist in the alternative and the decision to permit a defendant to proceed in a hybrid fashion rests in the sound discretion of the trial court." Mills, 704 F.2d at 1557. The Eleventh Circuit held that the trial court did not commit reversible error in a murder trial in denying the defendant permission for his appointed attorney to act as his co-counsel during the trial.
In this case, the defendant requested that he be allowed to represent himself and that his appointed attorneys be discharged and relieved from any further responsibility. Despite this request, the trial judge required the defendant's attorneys to "stand by" and to remain in the courtroom. Although he was not requested to allow and did not require counsel to sit at the defense table with the defendant, the trial judge repeatedly and almost continually reminded the defendant that counsel were available in the courtroom and that those attorneys were accessible to him at any time. On the third day of trial, the judge noted that "(i)n fact, they [counsel] have had free access to you during breaks and recesses and its been apparent that you have met with them and discussed certain matters with them." When the trial judge was informed by counsel that the defendant wished "to have an attorney to discuss some matters with," the judge delayed the trial until after the defendant had met with his attorneys. Then, before bringing the jury in, the trial judge reminded the defendant that "your attorneys will remain in the courtroom and they will so remain and be available for your use should you desire to consult with them or utilize their services."
When the defendant finally requested counsel, after the jury had returned its verdict of guilty, the defendant stated that he "would like to get my lawyers, see my lawyers as my co-lawyers." (Emphasis added.)
Society's interest in the fairness, reliability, and integrity of the trial of a capital case is preserved in this case because of Alabama's plain error rule, A.R.A.P. 45A, and due to the mandatory scope of automatic and required appellate review of a capital case. Alabama Code 1975, § 13A-5-53, § 13A-5-55, § 12-22-150, § 12-22-241. See 85 Colum.L.Rev. at 151.

II
The defendant claims that the evidence found in the vehicle he was driving when the Illinois officers stopped him should have been suppressed because it was the fruit of an illegal search.
Trial testimony and the defendant's own statements to the police established that the automobile had been stolen. A defendant has no expectation of privacy in a stolen vehicle and lacks standing to challenge its search. See Rakas v. Illinois, 439 U.S. 128, 143-44 & n. 12, 99 S.Ct. 421, 430-31 & n. 12, 58 L.Ed.2d 387 (1978); United States v. Hensel, 672 F.2d 578 (6th Cir.), cert. denied, 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982); Lippold v. State, 365 So.2d 1015 (Ala.Cr.App.1978), cert. denied, 365 So.2d 1022 (Ala.1979).

III
The defendant maintains that during voir dire of the jury venire, the prosecutor was permitted to obtain a commitment from the *45 venire persons members that they would, in effect, disregard a statutory mitigating circumstance, (§ 13A-5-51(7), Code of Alabama 1975, the defendant's age at the time of the crime), in arriving at a sentence recommendation.
From the record:
"MR. HUBBARD: Okay. We'll start with, again, this Defendant is nineteen years of age, would that, in your mind, if you believe beyond a reasonable doubt and to a moral certainty that this Defendant was, in fact, guilty of the offense of Capital Murder and that the case was so aggravated or aggravating type circumstances outweighed all of the mitigating circumstances, would you refuse to vote for the death penalty simply because the Defendant was nineteen years of age?"
In the exercise of its peremptory strikes either party has the right, within the trial court's discretion, to examine jurors on any matter which might tend to affect their verdict. Arthur v. State, 472 So.2d 650 (Ala.Cr.App.1984), rev'd on other grounds, 472 So.2d 665 (Ala.1985); Ex parte Ledbetter, 404 So.2d 731 (Ala.1981). A party may not, however, solicit a promise to return a particular verdict. Ex parte Dobard, 435 So.2d 1351 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984).
"`Questions concerning jurors' attitudes about capital punishment are not limited to those questions which would elicit information which would constitute grounds of a challenge for cause.'" Arthur v. State, 472 So.2d at 658; Brown v. State, 288 Ala. 684, 685, 264 So.2d 553, 554 (1972).
The prosecutor's question here was proper. It did not solicit a promise to return a sentence recommendation of the death penalty. It did not seek to have the jurors disregard a statutorily recognized mitigating circumstance. In fact, the explicit wording of the question reminded the jurors of their responsibility to weigh the aggravating and mitigating circumstances before arriving at a sentence recommendation. The question sought to identify, for peremptory strike purposes, any juror who felt that the defendant's youth, per se, disqualified him from the death penalty, and as such, it was unobjectionable.

IV
Section 13A-5-50, Code of Alabama 1975, which allows the jury and the trial judge in a capital case to find as an aggravating circumstance for sentencing purposes the same aggravating circumstance alleged in the indictment is not unconstitutional. The defendant's arguments regarding the statute's alleged infirmity center on its supposed redundancy and double punishment provisions. Those were the same theories advanced by the court in Bufford v. State, 382 So.2d 1162, 1173-74 (Ala.Cr. App.), cert. denied, 382 So.2d 1175 (Ala. 1980), and Keller v. State, 380 So.2d 926, 937 (Ala.Cr.App.1979), cert. denied, 380 So. 2d 938 (Ala.1980), both of which cases were effectively overruled by the Alabama Supreme Court's decision in Kyzer v. State, 399 So.2d 330, 334-339 (Ala.1981). See also Dobard v. State, 435 So.2d 1338, 1344 (Ala.Cr.App.1982), aff'd, 435 So.2d 1351 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984).

V
Our independent review of the defendant's conviction convinces us that the record contains no error which "has or probably has adversely affected the substantial right of the defendant." Rule 45A, A.R.A.P.
Pursuant to the mandate of § 13A-5-53, Code of Alabama 1975, we also find that no "error adversely affecting the rights of the defendant was made in the sentence proceedings," that "the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence," and that "death was the proper sentence in the case." The trial court made the following findings of fact from the punishment phase and sentence hearing:
"FINDINGS OF FACT BY THE COURT FROM THE PUNISHMENT *46 PHASE AND SENTENCE HEARING CONDUCTED BY THE COURT
"In accordance with the mandate of § 13A-5-47, Code of Alabama 1975 (as amended), the Court conducted a formal sentence hearing in this case on August 2, 1984. At said hearing, the Defendant appeared in person with his attorneys, Honorable H. Merrill Vardaman, Honorable John Thomason and Honorable Joseph Maloney and the State was represented by the Honorable Joseph D. Hubbard, Assistant District Attorney. A pre-sentence report was presented to the Court and Ordered to be made a part of the record. Neither the State nor the Defendant nor the Defendant's attorneys took exception to, offered anything in addition to or offered anything in regard to the pre-sentence report which had been prepared by the Probation and Parole Office and presented to the Court as ordered in this case. In accordance with the mandate of § 13A-5-47, the Court hereby makes the following findings in regard to the aggravating circumstances set out by § 13A-5-49, Code of Alabama. The Court finds:
"(1) That the capital offense or offenses of which the Defendant has been found guilty were committed while the Defendant was engaged in the commission of, or attempt to commit, or flight after committing, or attempting to commit, Burglary in the First Degree and Burglary in the Second Degree.
"(2) That the capital offense or offenses committed were especially heinous, atrocious or cruel when compared with other capital offenses.
"No other aggravating circumstances are found by the Court to exist in this case. The Court makes the following findings under § 13A-5-51, Code of Alabama 1975 (as amended), in regard to mitigating circumstances. The Court finds the following:
"(1) That the Defendant has no significant history of prior criminal activity.
"(2) That the Defendant was eighteen (18) years of age at the time of the commission of the crime or crimes charged in this case.
"In addition to the above, the Court has considered the evidence and testimony presented to the Jury in regard to the Defendant's background and character and in regard to his history of emotional problems as the same pertain to the mitigating circumstances that should be properly considered by the Court. The Court stresses that it considered the Defendant's emotional and behavioral history only in regard to mitigating circumstances and mitigating circumstances alone.
"The Court finds that the Jury in this case was not emotionally influenced with passion, prejudice, sympathy or any other arbitrary factors in arriving at its findings of guilt as to the capital offenses charged and as to the recommendation of punishment by death.
"The Court makes the further finding, as previously set out, that the Defendant, Pernell Ford, did murder the victims in this case, namely, Willie C. Griffith and Linda Gail Griffith, during the commission of a Burglary in the First and Second Degree, or an attempt thereof, also committed by the Defendant.
"After due consideration of all the matters that were presented to the Court during this hearing, both in mitigation and aggravation and taking into consideration all other matters that are properly before the Court as hereinabove stated in this Order, this Court does now find and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances shown above and brought before the Court far outweigh the mitigating circumstances shown to the Court, that said aggravating circumstances outweigh the said mitigating circumstances in all regards and that they are sufficient both in quantity and quality to more than uphold the Jury's Verdict recommending the death penalty in this case which Jury Verdict was given due consideration by the Court.
"It is therefore, the judgment of this Court that the Defendant, Pernell Ford, also known as Parnell Ford, also known *47 as Ponnell La'Sha Ford, be and he is hereby sentenced to death by electrocution."
Our determination whether the death penalty was the proper sentence in this case depends upon:
"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
"(2) Whether an independant weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Ala. Code § 13A-5-53(b) (1975).
Nothing in the record even suggests that the death penalty was imposed under the influence of passion, prejudice, or other arbitrary factor. On the contrary, the record reflects the conscientiousness of the trial judge, the prosecutor, and the stand-by counsel in affording the defendant a fair trial. Furthermore, our independent weighing of the aggravating and mitigating circumstances leads us to the conclusion that the death penalty is appropriate here. We find that the capital offenses were committed in the course of a burglary and that they were especially heinous, atrocious or cruel when compared with other capital offenses. Ala.Code 1975, § 13A-5-49(4) and (8). We are in accord with the trial judge's opinion that these two aggravating circumstances outweigh the following statutory mitigating circumstances which are present: (1) that the defendant has no significant history of prior criminal activity, and (2) that the defendant was eighteen years old at the time of the offense. Ala.Code 1975, § 13A-5-51(1) and (7), as well as other evidence offered in mitigationthe defendant's history of emotional problems.
Finally, we do not believe the death sentence imposed here is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. See Grayson v. State, 479 So. 2d 69 (Ala.Cr.App.), aff'd, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.), aff'd, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985); Lynn v. State, 477 So.2d 1365 (Ala.Cr.App. 1984), rev'd on other grounds, 477 So.2d 1385 (Ala.1985).
The conviction and sentence are affirmed.
AFFIRMED.
TAYLOR, PATTERSON and McMILLAN, JJ., concur.
TYSON, J., dissents with opinion.
TYSON, Judge, dissenting.
The role which standby counsel played at the capital murder trial of this appellant troubles me greatly.
While I concur in Part 1(a) of the majority opinion prepared by our able Presiding Judge, Parts (b) and (c) of Part 1 require my dissent.
It is true that the trial court in this instance went to great lengths to point out to this appellant the desirability of having counsel represent him in this cause. It is further true that standby counsel was appointed and was present in the courtroom throughout the "guilt phase" of the trial itself. Moreover, the appellant, himself, relented at the "sentencing phase" and agreed to have these attorneys represent him during that phase of the trial.
It is clear from the record in this cause that standby counsel was seated on the front row in the courtroom and not at counsel table during the "guilt phase" of the trial itself. It is also true that, at several points during recesses, the trial judge would point out that the "standby attorneys" were available should Pernell Ford choose to exercise his right to counsel. (R. 130, 131, 180, 184, 204, 342, 509, 555, 556 and 559).
The trial judge pointed out that the attorneys would not be present at counsel table *48 and would not be able to hand notes to this appellant. (R. 117).
It is my view of the above situation that the appellant was then presented with a "Hobson's Choice" to either represent himself alone or choose to be represented by counsel seated in the front of the courtroom.
It is also true that the appellant met with the three standby attorneys at various points during recesses during this trial. However, the passive role thus played by the three attorneys, in my judgment, deprived this appellant of a fair trial. Surely, other jurisdictions have found that it is desirable to have standby counsel sit at counsel table, make suggestions or notes and even offer objections or motions as may be deemed appropriate. See State v. Harding, 137 Ariz. 278, 670 P.2d 383 (1983); Commonwealth v. Davis, 479 Pa. 274, 388 A.2d 324 (1978); Goode v. State, 365 So.2d 381 (Fla.1978).
The ABA, Standards for Criminal Justice, § 6-3.7 (2d ed. 1980) state:
"When a defendant has been permitted to proceed without the assistance of counsel, the trial judge should consider the appointment of standby counsel to assist the defendant when called upon and to call the judge's attention to matters favorable to the accused upon which the judge should rule on his or her motion. Standby counsel should always be appointed in cases expected to be long or complicated or in which there are multiple defendants."
Surely, it cannot be seriously contended that a capital case is not complicated or, in most cases, lengthy. Furthermore, the irrevocability and finality of a possible death sentence in a capital case is sufficient reason to appoint standby counsel in order to insure that the defendant receives all the due process benefits which can be afforded to him.
There seems to be nothing in our Federal or State Constitutions to prohibit the appointment of standby counsel to a pro se defendant. In fact, the Alabama Constitution appears to expressly permit this practice. Ala. Const., Art. 1, Sec. 6 provides that, "... the accused has a right to be heard by himself and counsel, or either..." Therefore, I say that the right to counsel and the right to self-representation are not mutually exclusive. The defendant in a capital case, as well as society, will benefit by the appointment of "standby counsel" when the defendant chooses to represent himself. By this procedure, the defendant's freedom of choice will be preserved and, at the same time, a fair trial will be a more realistic and likely possibility.
My view of the role of standby counsel would in no sense trespass upon the appellant's right of self-representation under Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). See also McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984).
Because the exact limits of standby counsel's participation in the trial process in the presence of the jury has not been clearly defined, I find that the passive role of the three attorneys appointed in this cause was reduced to such an extent that the appellant's constitutional rights were not here properly protected. This passive role of standby counsel in a capital case did not protect this appellant's right to a fair trial or to due process of law during such trial. I, therefore, vote to reverse this case for the reasons stated.