ALMON, Justice.
This is a death penalty case. Certiorari was granted to determine whether the Court of Criminal Appeals erred in upholding the capital murder conviction and death sentence of the petitioner, Pemell Ford.
In 1984, Ford was convicted for the capital murder of Linda Gail Griffith and Willie C. Griffith, committed during the course of a burglary, Code 1975, § 13A-5-40(a)(4). The facts surrounding the petitioner’s crime and conviction are set forth in detail in the Court of Criminal Appeals’ opinion, 515 So.2d 34, and need not be restated here.
Ford argues that there is no constitutional right to self-representation. The United States Supreme Court has held to the contrary.
*50 “The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be ‘informed of the nature and cause of the accusation,’ who must be ‘confronted with the witnesses against him,’ and who must be accorded ‘compulsory process for obtaining witnesses in his favor.’ Although not stated in the Amendment in so many words, the right to self-representation — to make one’s own defense personally — is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.”
Faretta v. California, 422 U.S. 806, at 819, 95 S.Ct. 2525, at 2533, 45 L.Ed.2d 562 (1975). This right is also applicable in capital cases; see, Goode v. Wainwright, 704 F.2d 593 (11th Cir.), rev’d on other grounds, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983); Smith v. State, 407 So.2d 894 (Fla.1981), cert, denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982).
Ford argues that he was not competent to waive his right to counsel. In Faretta, the Court stated that when an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must “knowingly and intelligently” forgo those benefits. 422 U.S. at 835, 95 S.Ct. at 2541, citing Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The Court went on to say that although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that “he knows what he is doing and his choice is made with eyes open.” Faretta, supra, 422 U.S. at 835, 95 S.Ct. at 2541, quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942).
When Ford informed the court that he wanted to represent himself, the judge conducted a colloquy with him that covered 20 pages in the record. During this colloquy, the judge discussed Ford’s rights and discussed in detail each phase of the trial from the jury selection through the penalty phase. The court explained the advantages of having an attorney and how having an attorney could possibly make a difference in the outcome of the trial. The court also told Ford:
“I want it made known to you and I want you to fully understand and I want it clearly in the record that I, as the trial judge in this case, am recommending to you that you not proceed in this case representing yourself. To do so would be foolhardy, in my opinion, and I want you to understand that.”
It is clear, from the record, that the trial court carefully and completely explained the possible ramifications of representing oneself in a criminal proceeding in order that Ford be able to make a knowing, intelligent decision.
In determining whether Ford was competent to make the decision to waive counsel, the trial court heard testimony from three expert witnesses. The first to testify was Dr. Robert G. Summerlin, a private practitioner with a Ph.D. in psychology. Dr. Summerlin testified that Ford had an I.Q. of 80 and that he saw an emerging psychosis in him. He also testified, however, that there were some questions of the validity of the tests that he gave Ford and that he may have been “malingering or faking.” When asked whether Ford was competent to make an intelligent decision about relieving his attorneys from representing him, Dr. Summerlin replied, “I would have some questions about that competency.” He would not commit one way or the other. When questioned by the court as to whether Ford understood the colloquy between himself and the judge, he replied that he thought that Ford did.
The second expert to testify was Dr. Wallace W. Wilkerson, a licensed physician and board eligible psychiatrist who was at that time the medical director for the Cal *51 houn-Cleburne County Mental Health Board, Inc. Dr. Wilkerson testified that while Ford did appear to be a sociopath, he did not see any evidence of psychosis in him. Dr. Wilkerson testified that he felt that Ford’s I.Q. was higher than 80 — probably around 110. He also felt that Ford was “Feigning mental illness.” When asked if he thought Ford understood the colloquy between himself and the court, Dr. Wilkerson responded, “I think he understood every word that Judge Monk said to him.”
The final expert to testify as to Ford’s competency was Dr. Harry A. McClaren, who has a Ph.D. in clinical psychology and who was, at that time, the chief psychologist at Taylor Hardin Secure Medical Facility. When asked if Ford was competent to understand the charges that were pending against him, Dr. McClaren testified that Ford had articulated them personally to him and that he (Ford) understood them very well. During examination by the court, the following exchange took place:
“Q. [by the court] Okay. Let me make a statement to you about the law and then ask you a question based on it. The law says that an individual may waive a right provided he first knows he has that right and that his waiver of that right is one that is made knowingly, voluntarily, intelligently and in knowledge and understanding of the consequences or possible consequences of waiving the right.
“Now, based upon that statement of the law, do you have an opinion as to whether or not Mr. Ford is competent to proceed to ask the court to discharge his attorneys and allow him to proceed to defend himself?
“A. [by Dr. McClaren] In my opinion he knows that he has a right to counsel, he is operating at a sufficient degree of intelligence to make this judgment and I believe he understands the possible implications of going ahead with less than expert legal assistance.”
Of the three experts who testified, two were of the opinion that Ford was competent to make the decision to discharge his attorneys and one had “questions about that competency.” Based on this testimony, we hold that the trial court and the Court of Criminal Appeals did not err in ruling that Ford was competent to make the decision to waive his right to counsel.
Ford argues that he has a constitutional right to have standby counsel sit at the defense table with him. While the Court in Faretta held that a defendant has a right to represent himself, and in McKas-kle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), held that the trial court may appoint standby counsel to aid a pro se defendant in an advisory capacity, neither of those cases requires the appointment of standby counsel. Certainly neither of those cases requires that standby counsel sit at the defense table with the defendant.
The right to defend himself may be as important to the pro se defendant as the right to be present at all important stages of trial and the right to present testimony in his own behalf. Wiggins, supra, 465 U.S. at 179, 104 S.Ct. at 951.
Additionally, by placing standby counsel at the defense table, the court would be running the risk that counsel would interfere with the defendant’s defense and thus infringe upon his Faretta right of self-representation. If that interference is too great, then a conviction of the defendant could be overturned on those grounds.[1] By placing counsel in the front row of the courtroom, the trial court avoided this possibility. While counsel were not in a position to interfere with Ford’s defense, they were readily available to him if he had desired their participation.
Ford asserts that it was improper voir dire examination for the prosecutor to obtain from the prospective jurors a commitment that they would not allow a finding of *52 one of the statutory mitigating factors to prevent a recommendation of the death penalty. The question Ford complains of was as follows:
“Okay. We’ll start with, again, this defendant is 19 years of age. Would that, in your mind, if you believe beyond a reasonable doubt and to a moral certainty that this defendant was, in fact, guilty of the offense of capital murder and that the case was so aggravated or aggravating type circumstances outweighed all of the mitigating circumstances would you refuse to vote for the death penalty simply because the defendant was 19 years of age?”
A party may not solicit a promise to return a particular verdict. Ex parte Do-bard, 435 So.2d 1351 (Ala.1983), cert, denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed. 2d 203 (1984). In asking this question, the prosecutor was not asking for a commitment or promise from the prospective jurors to vote for the death penalty. He was merely attempting to determine if any of the potential jurors were of a mind-set that would affect their verdict as tending to show bias or interest. The parties have a right, within the sound discretion of the trial court, to do this. Ex parte Ledbetter, 404 So.2d 731 (Ala.1981). Furthermore, questions concerning jurors’ attitudes about capital punishment are not limited to those questions that would elicit information constituting grounds of a challenge for cause. Brown v. State, 288 Ala. 684, 264 So.2d 553 (1972); Arthur v. State, 472 So. 2d 650 (Ala.Crim.App.1984); rev’d on other grounds, 472 So.2d 665 (Ala.1985).
Ford argues that the use of the burglary as an aggravating circumstance violated his protection against double jeopardy. This argument was successfully used in Bufford v. State, 382 So.2d 1162 (Ala.Crim. App.), cert, denied, 382 So.2d 1175 (Ala. 1980), and Keller v. State, 380 So.2d 926 (Ala.Crim.App.1979), cert, denied, 380 So.2d 938 (Ala.1980). However, these cases have since been overruled by this Court. Ex parte Kyzer, 399 So.2d 330 (Ala.1981). See also Dobard v. State, 435 So.2d 1338 (Ala. Crim.App.1982), aff’d, Ex parte Dobard, 435 So.2d 1351 (Ala.1983), cert, denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). The aggravating circumstance charged in the indictment may be used as the circumstance aggravating that charge. Kennedy v. State, 472 So.2d 1092 (Ala. Crim.App.1984), aff’d, Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert, denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985); Julius v. State, 455 So.2d 975 (Ala.Crim. App.1983), aff’d, Ex parte Julius, 455 So. 2d 984 (Ala.1984), cert, denied, 469 U.S. 1132, 105 S.Ct. 817, 83 L.Ed.2d 809 (1985).
Ford claims that this capital offense was not especially heinous, atrocious, or cruel when compared to other capital offenses. The first degree murder of two or more victims is not, by definition, especially heinous, atrocious, or cruel. Ex parte Kyzer, 399 So.2d 330 (Ala.1981). In the present case, the victims died as the result of multiple stab wounds. It has been held that killings as a result of multiple stab wounds can support a finding of this circumstance. See, Dunkins v. State, 437 So.2d 1349 (Ala.Crim.App.), aff d, Ex parte Dunkins, 437 So.2d 1356 (Ala.1983). In addition, one of the victims, Willie Griffith, was 74 years old and had severe arthritis and watched helplessly as Ford killed her daughter (Linda). Ford then turned on Willie, killing her in much the same fashion.
Ford contends that allowing four potential jurors who were opposed to the death penalty to be struck for cause deprives him of his Sixth Amendment right to a jury made up of a cross-sectional representation of the community. The Constitution does not prohibit the states from “death qualifying” juries in capital cases. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The essence of a “fair cross-section” claim is the systematic exclusion of a “distinctive group” in the community. Groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as those adamantly opposed to the death penalty, are *53 not “distinctive groups” for fair cross-section purposes. Id.
The sentence of death was not imposed in an arbitrary or capricious manner, nor was it handed down under the influence of passion or prejudice. The sentence was appropriate, because the aggravating circumstances greatly outweighed the mitigating circumstances. Accordingly, the conviction and the sentence of death should be affirmed.
AFFIRMED.
MADDOX, JONES, BEATTY, ADAMS, HOUSTON and STEAGALL, JJ., concur.

. In McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the U.S. Supreme Court, in affirming the defendant's conviction, held that while in that case counsel’s interference in the defendant’s pro se defense was not great enough to threaten his Faretta rights, if it had been, reversal would have been required.