Pernell FORD, Petitioner-Appellant,

v.

Michael W. HALEY, Commissioner, Alabama Department of Corrections, Respondent-Appellee.

No. 99-10895.

United States Court of Appeals,

Eleventh Circuit.

Nov. 8, 1999.

Appeal from the United States District Court for the Northern District of Alabama. (No. 95-03020-CV-CV-B-S), Sharon Lovelace Blackburn, Judge.

Before ANDERSON, Chief Judge, and DUBINA and HULL, Circuit Judges.

HULL, Circuit Judge:

Petitioner Pernell Ford ("Ford") is an Alabama death row inmate who has filed recurrent requests to dismiss his § 2254 habeas petition, discharge his counsel, and be executed. Ford permitted his counsel, Ms. LaJuana Davis ("Davis"), to file and litigate his habeas petition for two years. However, in 1997, Ford began his quest to dismiss his petition and be executed. On March 31, 1999, the district court found Ford was mentally competent to forego further collateral review and granted Ford's pro se requests to dismiss his habeas petition and Davis as his counsel. Thereafter, Davis, as Ford's former counsel, appealed the district court's order. In *Ford v. Haley,* 179 F.3d 1342 (11th Cir.1999), we granted a stay of Ford's execution set for July 9, 1999, and held that Davis appeared to retain standing to the limited extent necessary to appeal the mental competency rulings in the district court's order.[1] We expedited briefing and oral argument in this appeal.

---

[1]As we explained in our earlier opinion,"[t]he standing issue here is arguably akin to a court's having limited jurisdiction to determine its own jurisdiction." *Ford v. Haley,* 179 F.3d 1342, 1345 n. 3 (11th Cir.1999). As we also noted earlier, if the "district court's finding that Ford is mentally competent is not clearly erroneous, then the district court correctly honored Ford's wishes to dismiss his attorney and his § 2254 habeas petition. *See Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976); *Lonchar v. Zant,* 978 F.2d 637 (11th Cir.1992). Accordingly, Davis, no longer Ford's attorney, would lack standing to pursue Ford's case further. However, if the district court's finding is clearly erroneous and Ford is mentally incompetent, then the dismissals of Davis and the petition were in error, and Davis may be entitled, as Ford's attorney, to pursue Ford's § 2254 habeas petition." *Id.* at 1345. "Otherwise, a district court would be able to find a defendant

Accordingly, the main issue we must address now is whether the district court erred in finding Ford competent to forgo further collateral review of his conviction and death sentence. We begin our analysis by reviewing the factual history of the state and federal court proceedings wherein Ford repeatedly has been examined by doctors and found competent. We next outline why we conclude that the district court's competency findings are supported by substantial evidence and that the district court did not clearly err in those competency findings. Lastly, because the merits of the competency issue have now been considered on appeal, we explain why Davis lacks standing to pursue this habeas petition further.

## I. STATE TRIAL

In 1984, Pernell Ford was sentenced to death in Alabama state court for murdering Willie C. Griffith and her daughter Linda Gail Griffith during the course of burglarizing their home. Ford admits that he killed the two women, who died of multiple stab wounds to the head, neck, and trunk. Additionally, the trial evidence that Ford committed these capital crimes was overwhelming. This evidence is detailed in the opinions of the Alabama appellate courts affirming Ford's conviction and sentence. *See Ford v. State,* 515 So.2d 34 (Ala.Crim.App.1986), *aff'd, Ex parte Ford,* 515 So.2d 48 (Ala.1987).

During the guilt phase of his trial, Ford waived counsel and conducted his own defense. Prior to permitting Ford to proceed pro se, the trial court conducted an extensive colloquy with Ford in which the court explained the rights that Ford would be relinquishing by representing himself at trial. *See Ford v. State,* 515 So.2d at 37-39.[2] Three mental health professionals testified regarding Ford's competence to waive counsel. Dr. Robert G. Summerlin, a psychologist hired at the request of the defense team, testified that Ford

mentally competent in a capital case to dismiss his counsel and dismiss with prejudice his § 2254 habeas petition in federal court and there never would be any appeal or review of that contested mental competency ruling." *Id.*

[2]At each step of the explanation, Ford acknowledged that he understood what he was being told; Ford stated that he had no questions. *See Ford v. State,* 515 So.2d at 39. When the trial court inquired why Ford wished to represent himself, Ford stated: "Well, I feel like I'm competent enough to—to represent myself. You know, I have been to Bryce's and I was found not insane, so I feel like I'm able to do it.... I'm the one facing trial; I should be able to represent myself." *Id.*

had an I.Q. of 80 and was competent to stand trial. Dr. Summerlin stated that Ford had the capacity to understand everything the trial judge explained to him, but was concerned that Ford may have made up his mind to proceed pro se and may not have been listening to the judge. Dr. Summerlin gave his opinion that Ford had a personality disorder with some indication of an "emerging psychosis." Although Dr. Summerlin was seriously concerned about Ford's mental ability to waive his right to counsel, Dr. Summerlin acknowledged that his doubts could be affected by the possibility of Ford's "malingering" or "faking bad."

Dr. Wallace W. Wilkerson, a psychiatrist whom the trial court selected, testified that in his opinion Ford was "far more intelligent" than an I.Q. of 80 would indicate, and estimated Ford's I.Q. to be closer to 110. Dr. Wilkerson found no evidence of "emerging psychosis" and stated that Ford was a sociopath, one who believes the law does not apply to him. He told the court that Ford "knows the system" and is "perfectly capable of knowing what to do to beat the system or confuse the system." In Dr. Wilkerson's opinion, Ford had a preplanned idea as to what he was going to do-disrupt the proceedings of this Court, feigning mental illness. Dr. Wilkerson concluded that Ford was competent to stand trial and competent to waive his right to an attorney. The third expert, Dr. Harry A. McClaren, chief psychologist at the Taylor Hardin Secure Medical Facility, also testified that Ford had an anti-social personality disorder, was competent to stand trial, and was competent to make the choice to dismiss his legal counsel.

The state trial court found that Ford was competent to stand trial and waive his counsel, but required Ford's three appointed attorneys to stand by in the courtroom throughout the trial and to be available to consult with Ford or take over should Ford change his mind about proceeding pro se. Standby counsel did not sit at Ford's table but remained in the courtroom. The trial court did not on its own require counsel to sit at Ford's table. However, the trial court repeatedly reminded Ford that standby counsel was available to him. During the trial, Ford actually consulted with standby counsel a number of times. During the guilt phase of the trial, Ford, proceeding pro se, made no opening, pressed no objections or motions, nor did he present a

3

defense. He tendered no requests to charge and did not object to the trial court's charge. Ford did make a closing argument during the guilt phase.

During the penalty phase of the trial, however, Ford allowed his standby attorneys to represent him. His counsel introduced various medical and psychological records of Ford and made a closing argument during the penalty phase. The jury recommended the death sentence. At the final sentencing before the trial judge, Ford proceeded pro se with standby counsel in the courtroom. Thereafter, the trial court sentenced Ford to death.

## II. STATE DIRECT APPEAL

On direct appeal, counsel represented Ford and argued, *inter alia,* ineffective assistance of counsel at trial because: (1) there should be no right to waive counsel in a criminal case; (2) Ford was incompetent to waive his right to an attorney; and (3) his standby counsel did not sit at the defense table with him.[3] The Alabama appellate courts upheld the trial court's finding that Ford was competent to waive his trial counsel and conduct his own defense. *Ex parte Ford,* 515 So.2d 48 (Ala.1987), *aff'g, Ford v. State,* 515 So.2d 34 (Ala.Crim.App.1986). The Alabama Supreme Court and the Alabama Court of Criminal Appeals affirmed the convictions and death sentence. *Ex parte Ford,* 515 So.2d 48 (Ala.1987), *aff'g, Ford v. State,* 515 So.2d

---

[3]The Alabama Court of Criminal Appeals rejected Ford's first ground of appeal as having no legal support. *Ford v. State,* 515 So.2d at 40. The Appeals Court also rejected the second ground, holding that the trial record demonstrated that Ford "was thoroughly apprised of the dangers, disadvantages, and consequences of proceeding without counsel." *Id.* at 40-41. The Appeals Court held that Ford's failure to make objections or motions or to otherwise present a defense at trial was irrelevant to the question of Ford's mental capacity to waive trial counsel. *Id.* at 41. Moreover, the Appeals Court held that Ford had the mental capacity to comprehend the implications of waiving his counsel. *Id.* at 42. Applying a more stringent standard than competency to stand trial, the Appeals Court looked to whether Ford was "free of mental disorder which would so impair his free will that his decision to waive counsel would not be voluntary," *id.* (quoting Peter R. Silten & Richard Tullis, *Mental Competency in Criminal Proceedings,* 28 Hastings L.J. 1053, 1067 (1977)). The Appeals Court also cited the "intentional relinquishment or abandonment of a known right or privilege" standard from *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and a California court's interpretation that the standard "is satisfied if the trial court finds that the defendant is free of mental disorder and is aware of the consequences of his insistence upon representing himself." *Ford v. State,* 515 So.2d at 42 (citing *Curry v. Superior Court,* 75 Cal.App.3d 221, 141 Cal.Rptr. 884, 888-89 (1977)).

4

34 (Ala.Crim.App.1986). The United States Supreme Court denied Ford's petition for a writ of certiorari. *Ford v. Alabama,* 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988).

The Alabama Court of Criminal Appeals ("Appeals Court") concluded that "[t]he record in this case leaves no doubt that the defendant was free of a mental disorder which would so impair his will as to render his waiver decision involuntary." 515 So.2d at 42. Specifically, the Appeals Court noted that all three experts unequivocally stated that Ford was competent to stand trial. Two experts were equally positive in their diagnoses that Ford was free of mental disease and competent to waive counsel. Even Dr. Summerlin, the one expert expressing some doubt about Ford's waiving counsel, was unwilling to characterize Ford's condition as anything more than indicative of "emerging psychosis" and acknowledged that his findings could have been colored by Ford's "faking bad."

Given the tentativeness of Dr. Summerlin's conclusions, as well as Dr. Wilkerson's testimony that Ford knew how to "beat" or "confuse" the system, the Appeals Court held that the trial court was warranted in concluding that Ford did not suffer from any mental disease which impaired his waiver of counsel. The Appeals Court also upheld the trial court's finding that Ford was intelligent enough to understand the consequences of his decision, especially in light of other testimony that Ford's I.Q. might be as high as 110. *Id.* In sum, the Appeals Court concluded that the psychological evidence, combined with the trial court's thorough colloquy with Ford as well as his responses, fully supported the trial court's finding that Ford was competent to waive counsel. *Id.* at 43. The Appeals Court also held that Ford had no constitutional right to have standby counsel sit at the defense table with him, and affirmed Ford's conviction and death sentence. *Id.*[4]

---

[4]Judge Tyson dissented from the Appeals Court's holdings regarding Ford's competency and standby counsel. Judge Tyson believed that Ford was "presented with a 'Hobson's Choice' to either represent himself alone or choose to be represented by counsel seated in the front of the courtroom," and that the passive role played by the three attorneys deprived Ford of a fair trial. *Ford v. State,* 515 So.2d at 48 (Tyson, J., dissenting). According to Judge Tyson, Ford's right to self-representation could have been honored in accord with society's interest in the right to counsel during a capital case through the requirement that appointed "standby counsel" actually sit with the defendant at counsel table throughout the case. This arrangement, in

5

The Alabama Supreme Court affirmed the Appeals Court's decision. Like the Appeals Court, the Alabama Supreme Court relied on the United States Supreme Court's ruling in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), which recognized that a criminal defendant could waive counsel so long as the accused did so "knowingly and intelligently." 422 U.S. at 835, 95 S.Ct. 2525 (citing *Johnson v. Zerbst,* 304 U.S. 458, 464-65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Further, the Alabama Supreme Court noted that *Faretta* requires that, although the defendant need not have the skill and experience of a lawyer in order to choose self-representation, "he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" 515 So.2d at 50 (quoting *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525 (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942))).

The Alabama Supreme Court observed that the trial court discussed Ford's rights and discussed each phase of the trial in detail. The trial court explained the advantages of having an attorney and how having an attorney could make a difference in the outcome of trial. The trial court explicitly recommended to Ford that he not proceed by representing himself and that Ford's representing himself would be foolhardy in the trial court's opinion. The Alabama Supreme Court concluded "that the trial court carefully and completely explained the possible ramifications of representing oneself in a criminal proceeding in order that Ford be able to make a knowing, intelligent decision." *Ex parte Ford,* 515 So.2d at 50.

Next, the Alabama Supreme Court examined whether Ford was competent to make the decision to waive counsel. The Court summarized how two of the three mental health experts testified that Ford was competent to decide to discharge his attorneys, while the third expert had questions about that competency but would not commit one way or the other. *Id.* at 50-51. Based on the expert testimony, the Alabama Supreme Court affirmed the trial court and the Appeals Court's decisions, and held that they "did not err in ruling that Ford was competent to make the decision to waive his right to counsel." *Id.* at 51. The Alabama

Judge Tyson's judgment, would best preserve the defendant's freedom of choice while at the same time making "a fair trial ... a more realistic and likely possibility." *Id.*

Supreme Court concluded that it was not error for appointed counsel to stand by within the courtroom but not sit at Ford's table.

### III. STATE HABEAS PETITION

On September 23, 1988, Ford's counsel filed his state "Petition for Relief from Conviction or Sentence." Ford's state habeas petition asserted fourteen errors, including issues related to Ford's mental competency to waive trial counsel.[5] In ruling on Ford's petition, the state habeas court noted that Ford, "on-again, off-again," filed in that court requests or motions to forego further appeals. However, the court declined to grant Ford's requests and proceeded to address the merits of Ford's habeas petition.

On March 1, 1991, the state habeas court found that Ford was competent to stand trial and to waive counsel at trial. The habeas court observed that the trial court specifically found that there was no indication that Ford was incompetent at any point in the proceedings. *State v. Ford,* Case CC 84-08 (Ala.Cir.Ct. Mar. 1, 1991), *aff'd,* 630 So.2d 111 (Ala.Crim.App.1991), *aff'd,* 630 So.2d 113 (Ala.1993), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). Prior to the state habeas hearing, Ford sought the appointment of a specifically named expert psychologist to assist him. The state habeas court declined to appoint the individual named in Ford's request but appointed Dr. Robert Summerlin, the psychologist who

---

[5]Ford's state habeas petition alleged, *inter alia,* these errors relating to Ford's mental competency: (1) "[d]enial of effective assistance" (both while represented by counsel and while pro se); (2) "[t]he Defendant's conduct demonstrates that he did not have the requisite mental capacity to waive his right to counsel;" (3) "[t]he Court inappropriately questioned the Defendant [sic] court appointed attorney about his capacity, creating an unfair conflict of interest between the Defendant and his attorney;" (4) "[t]he Defendant demonstrated an inability to competently handle any aspect of his own defense;" (5) "[t]he Court failed to request additional psychiatric evaluation on this Defendant conduct [sic] became more bizarre;" (6) "The trial was potentially unfair and lacked due process because the defendants [sic] mental capacity was never placed before the jury as a defense of insanity or diminished capacity;" (7) "[t]hat it is unconstitutional to sentence to death someone who was 18 years old at the time of the above reasons [sic] who represented himself and none of the grounds for a new trial have been waived because the Defendant had neither the mental capacity, training or knowledge to properly protect the record;" (8) "[b]ecause [of] Defendant's mental incompetence the jury was not permitted to consider the possible insanity or diminished capacity of the Defendant as a defense and the defense could not be properly placed before the jury;" (9) "[b]ecause of the Defendant's own representation the jury could not consider the Defendant's mental condition in regard to the claim of aggravating circumstances or in relationship to mitigating circumstances."

7

assisted Ford at trial and was already familiar with his mental condition. The state habeas court held that in post-conviction proceedings Ford was not entitled to the appointment of an expert of his own choosing.

The state habeas court reviewed the Appeals Court's findings which were made on direct review. Specifically, the state habeas court examined the Appeals Court's treatment of the extensive colloquy the trial judge held with Ford, *see Ford v. State,* 515 So.2d at 37-39, along with its treatment of the testimony of the three experts, *see id.* at 39-40. The state habeas court found that the Appeals Court's discussion was an accurate rendition of the trial record, and that nothing was presented at Ford's habeas hearing to call any of the findings into question. The state habeas court denied Ford's petition, finding him competent, as follows:

> Two mental health professionals, Wallace Wilkerson, M.D., a psychiatrist who examined Mr. Ford both in 1984 and 1989, and Wilbern Rivenbark, Ph.D., testified that, in their opinions, Mr. Ford was competent to waive counsel at trial. At most, Mr. Ford was found to suffer from an anti-social personality disorder. In their opinion, and the Court finds, Mr. Ford knew what he was doing in waiving counsel and was not, and presently is not, insane, incompetent, or suffering from any thought or mood disorder.

Although ruling on the merits of Ford's competency claim, the state habeas court further noted that Ford's competency to discharge counsel and proceed pro se was decided unfavorably on direct appeal and that Rule 20.2(a)(4), A.R.Cr.P. (currently Rule 32.2(a)(4)), precludes relief on a decided issue raised on appeal. Similarly, regarding the trial court's asking trial counsel about Ford's capacity to waive counsel, the state habeas court found that this claim could have been raised on direct appeal and was now procedurally barred but that the claim was without merit even if considered. Ford's attorney first advised the trial court of Ford's desire to proceed pro se and only then did the trial court ask Ford's counsel to state an opinion as to his client's competency to waive counsel. In the state habeas court's opinion, this did not create any conflict and in any event was known, available for review on direct appeal, and now barred.

Finally, the state habeas court held that there was no law supporting the proposition that self-representation in a capital case is per se improper or unjust. The court noted it would be error to deny a defendant's request to proceed pro se where he was found competent to make such a decision. In any event, the court found that this claim could have been raised on appeal, was not, and is barred. Ford's counsel

8

appealed the state habeas court's decision, and the Alabama Appeals Court affirmed. *Ford v. State,* 630 So.2d 111 (Ala.Crim.App.1991). In particular, the Appeals Court declined to expand *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), to entitle a criminal defendant to the assistance of a psychologist of his own choosing during a post-conviction proceeding. *Ford v. State,* 630 So.2d at 111.

On October 29, 1993, the Alabama Supreme Court affirmed the state habeas court's denial of Ford's petition and held that certain grounds in his petition were "precluded by Rule 32.2(a)(4), A.R.Cr.P. (grounds that '[were] raised or addressed on appeal') and Rule 32.2(a)(5) (grounds that 'could have been but [were] not raised on appeal')." *Ex parte Ford,* 630 So.2d 113, 114 (Ala.1993) (as modified on denial of rehearing), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). The Alabama Supreme Court also held that Ford's argument that "he is entitled to a new trial because, he says, his right to waive counsel became void when ... his lack of competence to waive counsel became apparent by his bizarre behavior at trial" was precluded by Rule 32.2(a)(5). *Id.* at 115. Finally, the Alabama Supreme Court held that the Appeals Court properly affirmed the state habeas court's denial of Ford's request for the assistance of a mental health expert of his own choosing. *Id.*

## IV. FEDERAL HABEAS PETITION

On November 21, 1995, Ford's counsel filed his § 2254 habeas petition in the United States District Court for the Northern District of Alabama. This was Ford's first federal habeas petition. In May 1997, Ford pro se filed a form requesting that the district court dismiss his appeal, and that an execution date be set. Ford's attorney responded that he was not mentally competent to dismiss his § 2254 petition or his counsel. Before acting on Ford's pro se request, the magistrate judge held two evidentiary hearings.

A.    *Evidentiary Hearings*

At the first hearing on September 5, 1997, the magistrate judge had Ford appear in order to inquire if he truly wanted to dismiss his attorney and to observe his mental condition. At the hearing, Ford made it clear that he knew that termination of his legal proceedings would mean his death by electrocution, and stated

that was his desire. The magistrate judge found that "there was nothing about petitioner's demeanor or behavior which indicated mental incompetence, and ... the state court had twice found him competent."

Nevertheless, the magistrate judge ordered that Ford's prison medical records be submitted because Ford's counsel contended they contained evidence that Ford suffered from mental illness requiring anti-psychotic medication. Those prison records indicated that Ford had suffered from psychosis, paranoia, and depression during his incarceration and that medication improved Ford's mental condition, but that he sometimes refused to take it. In light of this information, the magistrate judge appointed a psychiatric expert to examine Ford's current competency. The parties submitted the names of three experts. Over respondent's objections, the magistrate judge selected Dr. Robert Rollins, an expert submitted by Ford's counsel. Dr. Rollins is the Chief Forensic Psychiatrist at Dorothea Dix Hospital in Raleigh, North Carolina, and has performed 200 mental competency evaluations a year in criminal cases since 1972.[6]

After evaluating Ford on March 14, 1998, Dr. Rollins submitted a written report dated April 24, 1998, finding that Ford is competent to dismiss his counsel and his § 2254 petition, as follows:

> My diagnoses are depressive disorder NOS (not otherwise specified); personality disorder with dependent traits; polysubstance abuse by history, antisocial behavior by history, attention

---

[6]In appointing Dr. Rollins, the magistrate judge directed him to make findings that would assist the court in determining whether Ford:

> "has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees v. Peyton,* 384 U.S. 312, 314, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966). Specifically, Dr. Rollins's findings should assist the court in determining (1) whether the petitioner suffers from a mental disease, disorder or defect, (2) whether a mental disease, disorder or defect prevents the petitioner from understanding his legal position and the options available to him; and (3) whether a mental disease, disorder or defect prevents the petitioner from making a rational choice among his options. *Lonchar v. Zant,* 978 F.2d 637, 641-42 (11th Cir.1992) (citation omitted).... Dr. Rollins's findings should assist the court in determining whether the petitioner has both a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824, 825 (per curiam). *See Godinez v. Moran,* 509 U.S. 389, 400-402, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (citations omitted).

10

deficit hyperactivity disorder by history, learning disorder by history, and relational problem (conflicts with family).

At the time of my interview Mr. Ford did not manifest symptoms of schizophrenia or major depression. I do not think anti-psychotic medication is indicated.

...

Mr. Ford does have a mental disorder (depression and personality disorder), but this disorder does not prevent Mr. Ford from understanding his legal position and the options available to him or making a rational choice among his options. He has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understandings of the proceedings against him.

After Dr. Rollins's report was filed, Ford's counsel, Davis, filed a motion requesting that Ford be examined by Dr. Jonathan Pincus, another psychiatrist. According to the magistrate judge, "[t]he stated purpose of that examination was to obtain information which would likely shorten Ms. Davis' examination of Dr. Rollins at the evidentiary hearing." The magistrate judge granted the motion.

At the next evidentiary hearing on June 10, 1998, Dr. Rollins testified regarding why he found Ford competent. While observing that Ford "is alienated, fed up, tired out, generally is pessimistic," Dr. Rollins also found that "in interpersonal interaction he can be engaging, chatting, funny, cordial. He is not always depressed." Dr. Rollins described problems during Ford's developmental period and how Ford has attempted suicide several times. He attributed Ford's behavior to his living on death row, but stated that Ford was "making a reasonable adjustment to that situation."

Although Ford has depression and a personality disorder, Dr. Rollins found no evidence of neurological impairment and testified that Ford is not mentally retarded. Rather he opined that Ford "is of normal intellectual ability but because of the lack of educational, cultural experiences on the formal testing, he tests in the borderline intellectual function range." Dr. Rollins further found: that Ford's orientation is "intact," that he is "able to proceed logically from one topic to another and his thinking is organized," that he "is able to perceive and understand," and that his memory is "good." According to Dr. Rollins, Ford's judgment "is impaired in the sense that he has lifelong difficulty in adapting to the world around him and he

11

has made some bad decisions. But he is able to focus on this present task at hand and come to an opinion. And in [Dr. Rollins's] view, that opinion is not influenced by mental disorder. He is able to make that judgment."

Dr. Rollins also testified that Ford's religious beliefs are not delusional. After execution, Ford thinks that he is going to sit at God's left hand and be an important person. Dr. Rollins took this to mean that Ford "believes in the afterlife that he is going to have a cherished position in heaven, that he is going to be respected, and that he is going to be comfortable and happy there." Dr. Rollins found that "what Mr. Ford thinks will happen following his death is his own interpretation of the Bible and his own religious beliefs." Ford's counsel explored with Dr. Rollins the possibility that Ford's religious beliefs are actually grandiose delusions. In Dr. Rollins's clinical determination, Ford's religious beliefs are not a symptom of a mental disorder. Instead, Dr. Rollins explained that Ford "doesn't have the educational or philosophical background perhaps to take more than a fairly direct interpretation of the Bible. I mean, he is not a Biblical scholar by any means, but he is a person under stress who is turning to religion for support and particularly because he doesn't have other kinds of support available to him."

Dr. Rollins concluded that Ford's depression and personality disorder do not affect Ford's competence to dismiss his federal habeas petition. He offered several rational reasons to support Ford's decision, including Ford's feeling that if he would be represented by counsel at a new trial, the result would turn out the same.[7]

The magistrate judge then questioned Ford. Ford understood the consequences of dismissing the habeas petition, as well as his options. Thereafter, Ford's counsel elicited testimony from Ford about his

---

[7]Ford is Dr. Rollins's seventh competency evaluation in a death case. In five previous cases Dr. Rollins opined that the persons were competent to be executed. In another he opined that the person was not competent to be executed. In the remaining case he concluded that the person was competent to be executed but not competent to waive his rights; Dr. Rollins recommended treatment and reevaluation. Additionally, in twenty-five percent of Dr. Rollins's evaluations in general criminal cases, he has found the defendant incompetent.

12

ability to "translate" to places outside prison. Ford stated that he had many wives, concubines, and children whom he had visited in various parts of the world, that he had been to church with one of his prison guards, and that he had once "visited Heaven." Ford also testified that he has millions of dollars in a Swiss bank account and that after death he will sit at the left hand of God and be a member of the Holy Trinity.

After hearing Ford's testimony about "translation," Dr. Rollins declined comment, but requested to reexamine Ford. Dr. Rollins also talked to a psychiatrist and a psychologist who had treated Ford during his incarceration and reviewed mental health records from Ford's incarceration.[8] After reexamining Ford on June 16, 1998, Dr. Rollins filed an "Addendum Psychiatric Evaluation" dated June 29, 1998 ("Addendum report"). In that Addendum report, Dr. Rollins found that Ford's "translation" beliefs represent "fantasy or wish fulfillment" and do not impair Ford's ability to make decisions, stating:

> Translating may represent malingering, fantasy, or impaired reality testing. Mr. Ford explains that he did not mention translating in the first interview, as he was concerned that I would consider him mentally ill. I exclude malingering because I cannot identify a goal to be accomplished in this situation by simulation of mental disorder and Mr. Ford concealed information about translation rather than putting it forward, as is the case in malingering.

> If translation represents impaired reality testing (i.e.—psychoses), it is an isolated delusional disorder and does not impair Mr. Ford's daily functioning. Mr. Ford was unable or unwilling to provide specific detail about translation activities.

> It is my assessment that the translation represents fantasy or wish fulfillment.

> In any event, Mr. Ford's ability to make decisions is not impaired by translation. Mr. Ford is able to communicate and interact with others. He makes decisions about his daily activities and interactions. He decides who to ask for money and how to spend his money. He would be considered competent to consent to surgery, make a will, or enter in financial transactions.

In this Addendum report, Dr. Rollins concluded again that Ford is competent to withdraw his habeas petition, to abandon further proceedings regarding his capital murder conviction and sentence, and to waive his right

---

[8]Dr. Rollins spoke with Dr. Williams, a psychiatrist who knew Ford for several years. Dr. Williams reported to Dr. Rollins that since June 17, 1998, Ford had been "friendly, coherent, lucid, faintly hypomanic, no distress." Dr. Rollins also talked with Mr. Crum, a psychologist who knew Ford for several years, who considered Ford to be making "a good adjustment." Ford never discussed "translating" with either Dr. Williams or Mr. Crum. Dr. Rollins also spoke with the prison guard whom Ford mentioned.

to the assistance of counsel. Dr. Rollins did note that "Ford stated that he would continue his appeals if he had an income of $50 per month or if there was a possibility that a judge would grant a new trial which would lead to a sentence with a specific release date (as opposed to life without parole)." Dr. Rollins interpreted these statements as showing only that Ford was ambivalent about his decision to withdraw his habeas petition.

Following the submission of the Addendum report, Ford's counsel filed papers entitled "Offers of Proof," criticizing Dr. Rollins's opinions. To her "Offers of Proof," Ford's counsel attached the results of a mental evaluation of Ford on July 13, 1998, by Dr. Jonathan H. Pincus, a neurologist and professor at Georgetown University Medical School. Dr. Pincus concludes that Ford is not mentally competent to dismiss his counsel and his habeas petition. Dr. Pincus found that the results of his neurological examination of Ford and his psychiatric history indicated brain damage in the right hemisphere of his brain, possibly caused by his premature birth. The magistrate judge considered the "Offers of Proof" as a motion for leave to present additional evidence. Respondent filed written objections to any consideration of Dr. Pincus's report.

Thereafter, the magistrate judge spoke again with Ford via telephone, because Dr. Rollins interpreted Ford's statements about having fifty dollars a month in prison to show ambivalence about dismissing his habeas petition. Speaking with the magistrate judge with his counsel also on the telephone line, Ford stated unequivocally that he wanted to dismiss his attorney and his habeas petition.

B.      *Magistrate Judge's Report and Recommendation*

On August 26, 1998, the magistrate judge filed a report recommending that Ford be found mentally competent to dismiss his § 2254 habeas petition and his counsel. The report noted that between May 4, 1997 and August 18, 1998, Ford had sent fourteen letters repeatedly expressing his desire to have his habeas petition dismissed.

The magistrate judge's report summarized Ford's mental and emotional history from childhood to the present, reviewing in detail the expert testimony regarding Ford's being found competent in the state trial and habeas courts. In his report, the magistrate judge sustained the respondent's objections to the consideration

of Dr. Pincus's report, finding "Dr. Rollins was one of the psychiatrists nominated by Ford's counsel and that the proffer of Dr. Pincus's report was untimely." Although the June 16, 1998 hearing was to conclude the evidence, it was not until after Dr. Rollins submitted his Addendum report that Ford's counsel mentioned that she intended to submit a report from Dr. Pincus. The magistrate judge found that Ford's counsel knew well before the June 16 hearing of Ford's "translating" and that the respondent had not been given the opportunity to confront the report, cross-examine Dr. Pincus, or to submit its own expert.

Alternatively, the magistrate judge found that even if Dr. Pincus's report was considered, Dr. Rollins's testimony is more persuasive than Dr. Pincus's. The magistrate judge agreed with Dr. Rollins that Ford's belief in "translating" did not affect his ability to decide that he wants to end the lengthy legal proceedings in his capital murder conviction and death sentence. The magistrate judge further found that Ford's reasons for dismissing his habeas petition are not irrational or the product of mental disease. For example, Ford does not believe a retrial would result in any difference. Ford states that he is tired of his life on death row and tired of fighting for, at best, life imprisonment without possibility of parole. Ford thinks something better awaits him and that he is "supposed to be punished for [his] crime." The magistrate judge concluded that "Ford's capacity to appreciate his legal position, the options available to him, and the consequences of his actions is not affected by any mental disease." Accordingly, the magistrate judge's report recommended that Ford be found mentally competent to dismiss his habeas petition and his counsel.

C.    *District Court's Order*

On March 31, 1999, the district court independently found that Ford was competent to dismiss his § 2254 habeas petition and his counsel. The district court also overruled the objections to the magistrate judge's report and recommendation filed by Ford's counsel.[9]

---

[9]In the objections, Ford's counsel complained that the magistrate judge did not conduct an adversarial proceeding, refused to grant certain discovery requests, and precluded response to Dr. Rollins's report, such as testimony by Dr. Pincus. The district court correctly observed that Dr. Rollins was a psychiatrist nominated by Ford's counsel as a neutral expert and that the magistrate judge never forbid the parties from submitting their own experts. When Ford's counsel untimely submitted Dr. Pincus's report, the magistrate

15

In evaluating Ford's competency, the district court applied the three-prong test in *Lonchar v. Zant,* 978 F.2d 637, 641-42 (11th Cir.1992), which requires a court to determine: "(1) whether the petitioner suffers from a mental disease, disorder or defect, (2) whether a mental disease, disorder or defect prevents the petitioner from understanding his legal position and the options available to him; and (3) whether a mental disease, disorder or defect prevents the petitioner from making a rational choice among his options." The district court held that under *Lonchar* Ford need not understand the particulars of each legal issue framed in the petition or the likelihood of prevailing on any or all of them, as his counsel argues. Instead, the district court noted that in *Lonchar,* the Eleventh Circuit found Lonchar competent under the second and third prongs (1) because Lonchar knew what he had been charged with, the penalty that had been handed down, and the ultimate outcome if the penalty is imposed on him, and (2) because Lonchar exhibited a basic understanding of the habeas proceedings, persisted in his opposition to further review of his convictions, and stated that he understood that without further proceedings he would be executed. The district court found that Ford, similar to defendant Lonchar, understood the "bottom line" of his legal situation-that he must continue to engage in the review process or be executed-and that he was able to make a rational choice among these options. The

---

judge nevertheless considered that report. The district court properly found that the magistrate judge's conducting three hearings on the matter, during each of which Ford's counsel had the opportunity to state her position and present extensive evidence, was sufficient. The district court accurately pointed out that "[i]t appears that [the magistrate judge] took great pains to ensure that Ms. Davis [Ford's counsel] had ample opportunity to state her position and support it, and to ensure that relevant evidence would be presented and considered. If anything, the process employed by [the magistrate judge] afforded Ms. Davis an advantage over the respondents, as her nominee was chosen as the court's expert and as the court considered the findings of Ms. Davis's own expert as well, whereas the respondent did not offer any expert testimony."

The district court also properly found that the reason for many of the discovery requests was to provide background information to Dr. Rollins about Ford, but Dr. Rollins examined the motion and stated that he did not need any of the requested information to evaluate Ford's competence. Furthermore, Dr. Pincus did not report that he lacked information critical to forming an opinion about Ford's competence. Thus, the district court concluded that the denial of Davis's discovery requests was not as significant as Davis argued. The district court accurately noted that Ford's counsel never presented Dr. Pincus for questioning at any hearing, and never requested a continuance to do so. In any event, the magistrate judge actually considered Dr. Pincus's report.

district court concluded that Ford need not understand the particular of each legal claim listed in his habeas petition, or the likelihood of his prevailing on any or all of these claims.

The district court also acknowledged that Ford has "significant behavioral and emotional problems" and that he has led a very troubled life. However, even if Ford meets the first prong of *Lonchar,* the district court found that Ford fails *Lonchar*'s second prong because he plainly understands that, in his legal situation, he must choose either to continue his legal challenges or be executed. The court found that Ford also fails *Lonchar*'s third prong because he has rational reasons for choosing this latter option: he is weary of languishing in prison, he is justly pessimistic that he will ever get out of prison, and he believes that he will be happier in the afterlife. Although Ford's counsel argues that insane delusions are driving him effectively to commit suicide, the district court agreed with the magistrate judge that Ford's overall testimony proves otherwise and that Dr. Rollins's testimony supports the finding that Ford is competent to dismiss his habeas petition.

The district court also found that Ford is competent to waive his counsel and proceed pro se. The district court determined that Ford is competent to dismiss his counsel if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." (District Court Order, Mar. 31, 1999, at 17, quoting *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam), and citing *Godinez v. Moran,* 509 U.S. 389, 400-02, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)). The district court then found that Ford clearly understands his legal situation, the significance of the proceedings against him, and the choices available to him. Ford knows what he was convicted of and how he came to be in his current legal situation.

Further, the district court determined that Ford understands the ramifications of dismissing his habeas petition and is able to consult with his lawyer rationally. The court observed that Ford rationally explained why he allowed his counsel to file a habeas petition on his behalf and why he changed his mind and decided to dismiss it. Ford also was able to recount the rationale his counsel offered to him for proceeding with the

habeas petition, rather than dismissing it. Finally, the district court concluded that "[Ford's] testimony as whole [sic] shows that he can communicate with other persons rationally and that he is capable of rationally consulting with an attorney," and that Dr. Rollins's reports further support the finding that Ford is competent to dismiss his attorney.[10]

After reviewing the entire record, the district court reached an independent conclusion that Ford is competent to dismiss his § 2254 petition and his counsel. The district court announced that it "deplores the petitioner's decision to dismiss his habeas petition," but recognized that Ford had the right to make the decision, as the evidence indicates he is competent to do so. On March 31, 1999, the district court granted Ford's request to proceed pro se and granted Ford's motion to dismiss his § 2254 habeas petition. The district court dismissed Ford's petition with prejudice.

D.    *Appeal and Stay of Execution*

On April 14, 1999, Davis, signing as Ford's attorney, filed in Ford's name a Motion to Alter and Amend the Judgment, a Notice of Appeal of the district court's March 31, 1999 order, and a Motion for Stay of Execution. On July 1, 1999, the district court denied the Motion to Alter and Amend and the Motion for Stay of Execution.

On July 6, 1999, Davis, again signing as Ford's attorney, filed a Notice of Appeal of the district court's July 1, 1999 order. On July 6, 1999, Davis also filed a Motion for Certificate of Probable Cause to Authorize Appeal, which the district court granted. On July 7, 1999, this Court held that Davis, as Ford's prior counsel, appears to have standing on behalf of Ford to appeal the limited issue of Ford's competence

---

[10]On appeal, Ford's counsel primarily challenges the district court's application of *Lonchar*'s requirements and the findings that Ford is competent to dismiss his § 2254 habeas petition and forgo further collateral review of his conviction and death sentence. Thus, our opinion focuses on those competency issues. However, to the extent Ford's counsel argues that the district court also erred in finding that Ford is competent to dismiss his attorney and proceed pro se, we find that argument also lacks merit. Substantial evidence supports the district court's findings that Ford is competent to dismiss his attorney and proceed pro se, including Ford's own testimony and Dr. Rollins's reports and testimony.

to discharge his counsel and dismiss his habeas petition filed by that counsel. *Ford v. Haley,* 179 F.3d 1342, 1345-46 (11th Cir.1999).

Further, in accordance with Eleventh Circuit Rule 22-3, we granted a stay of execution to prevent the issue of Ford's competency from being mooted by his execution prior to our review. *Id.* at 1346. We advanced the briefing schedule and, on August 18, 1999, held oral argument.

## V. STANDARD OF REVIEW

Whether Ford is competent to dismiss his § 2254 habeas petition in order to be executed in a capital case is a factual question. *Lonchar v. Zant,* 978 F.2d 637, 640 (11th Cir.1992) ("Whether Larry Lonchar is competent to forgo collateral review of his conviction is a factual question.") (citing *Rumbaugh v. Procunier,* 753 F.2d 395, 398-99 (5th Cir.), *cert. denied,* 473 U.S. 919, 105 S.Ct. 3544, 87 L.Ed.2d 668 (1985)); *see United States v. Hogan,* 986 F.2d 1364, 1371 (11th Cir.1993) (holding that the district court's determination of defendant's competency to stand trial is reviewed under clearly erroneous standard). This Court, therefore, must "accept the district court's findings unless we find them to be clearly erroneous." *Lonchar,* 978 F.2d at 640; *see also* Fed.R.Civ.P. 52(a). "Finding[s] of fact [are] clearly erroneous only when we are left with a definite and firm conviction that a mistake has been committed." *United States v. Roy,* 869 F.2d 1427, 1429 (11th Cir.1989). To the extent Ford's counsel contends that the district court misinterpreted *Lonchar* 's three legal requirements, we review those legal questions *de novo.*

## VI. DISCUSSION

A.    *Competency Test*

In *Rees v. Peyton,* 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), the United States Supreme Court established the test for determining competency to waive post conviction review in a capital case. The test is whether a defendant has the "capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees,* 384 U.S. at

19

314, 86 S.Ct. 1505. This Circuit explained in *Lonchar v. Zant,* 978 F.2d 637, 641 (11th Cir.1993), that applying the *Rees* test "involves a determination of (1) whether that person suffers from a mental disease, disorder, or defect; (2) whether a mental disease, disorder, or defect prevents that person from understanding his legal position and the options available to him; and (3) whether a mental disease, disorder, or defect prevents that person from making a rational choice among his options." *Lonchar,* 978 F.2d at 641-42 (citing *Rumbaugh v. Procunier,* 753 F.2d 395, 398 (5th Cir.), *cert. denied,* 473 U.S. 919, 105 S.Ct. 3544, 87 L.Ed.2d 668 (1985)).

The district court applied the *Rees* test in the precise manner instructed in *Lonchar.* At the outset, the district court found that Ford suffered from depression and a personality disorder, both of which are mental disorders. Thus, the district court correctly assumed that the first prong of *Lonchar* was met. However, the district court then found that neither of *Lonchar* 's other two prongs was met and that Ford was competent to dismiss his habeas petition and his counsel. We hold that the district court's findings are not clearly erroneous for the reasons outlined below.

B.      *Lonchar 's Second Prong*

 Under *Lonchar* 's second prong, this Court requires that the defendant's mental disorders must impair his ability to understand his legal position and the options available to him before a finding of incompetency can be made. *Lonchar,* 978 F.2d at 641-42. Here, the district court expressly found that Ford clearly understood that the state of Alabama would move the Alabama Supreme Court to set an execution date as soon as the habeas petition was dismissed and understood that he would not be able to file any further pleadings in federal district court. The district court determined that Ford's mental disorders did not prevent him from understanding his legal position and the options available to him. This finding is supported by substantial evidence in this record.

For example, Dr. Rollins's two reports support the district court's determination. In his initial report, Dr. Rollins expressly found that "Mr. Ford does have a mental disorder (depression and personality disorder),

20

but this disorder does not prevent Mr. Ford from understanding his legal position and the options available to him." Dr. Rollins further testified at the June 10 evidentiary hearing that Ford understood that he was on death row and that dismissal of his habeas petition would result in his execution.[11]

After reexamining Ford on June 16, 1998, Dr. Rollins also filed an Addendum report in which Dr. Rollins again concluded that Ford understood his legal position and options available. Dr. Rollins reported, "Mr. Ford ... is able to make daily decisions. He understands that if he withdraws his appeal, '[he] will be killed' ... Mr. Ford thinks that, at best, a new trial would lead to life without parole." Dr. Rollins's reports demonstrate that Ford is capable of understanding his legal position—he is on death row—and the options available to him—he can choose to be executed or fight the sentence and spend his life in prison.

Perhaps the most persuasive evidence that Ford understands his legal position comes from Ford's own testimony at the two evidentiary hearings and his fourteen letters to the magistrate judge. At both hearings, Ford testified that he understood the state would move for an execution date as soon as his habeas petition was dismissed and that he would not be allowed to file any further proceedings. Ford's fourteen letters in the record before the district court all express a consistent desire to have proceedings ended and for his execution to proceed. Additionally, Ford was able to explain why he allowed his legal counsel to file a habeas petition on his behalf and why he changed his mind and decided to dismiss it.

Ford's counsel argues that the district court erred in its analysis of *Lonchar*'s second requirement by limiting its inquiry to the general issue of whether Ford recognized he was on death row and understood that dismissal of his habeas petition would result in his execution. Ford's counsel contends that *Lonchar*'s second prong requires an examination of whether the defendant understood the particulars of each legal issue framed in his habeas petition. Ford's counsel points to Dr. Rollins's examination of Ford as evidence that he is unaware of the legal particularities which he would waive by dismissing his habeas petition. Regarding the

---

[11]In response to the question, "Does Mr. Ford understand, in your opinion, that if his habeas petition is dismissed that the state will move for execution, quickly?", Dr. Rollins testified, "Yes, he desires that."

specific legal issues contained within the habeas petition, Dr. Rollins responded, "Well he doesn't know and I don't know either."

This argument by Ford's counsel is premised on a misunderstanding of the required showing under *Lonchar* 's second prong. Under *Lonchar,* a petitioner need not understand each of the legal issues framed in his habeas petition. In *Lonchar,* this Court found that the petitioner satisfied the second prong because "[the] individual knows what he has been charged with. He recognizes the penalty that has been handed down and what the ultimate outcome of that penalty will be if it, in fact, is imposed upon him." 978 F.2d at 642. This Court held that the defendant satisfied this requirement where "[he] exhibited a basic understanding of the habeas proceedings, persisted in his opposition to further review of his convictions, and stated he understood that without further proceedings, he would be executed." *Id.*

In this case, Ford recognizes that the crime he was convicted of is murder; the penalty that has been handed down is execution; and the ultimate outcome of the penalty will be death. As outlined in Dr. Rollins's report, Ford understands that if he withdraws his appeal, he will be executed. The report also discusses Ford's understanding of the habeas procedure and his assessment that, "at best, a new trial would lead to life without parole." Ford admits that he killed the two victims and the trial evidence that Ford committed these capital crimes was overwhelming. *See Ex parte Ford,* 515 So.2d 48 (Ala.1987), *aff'g, Ford v. State,* 515 So.2d 34 (Ala.Crim.App.1986). Thus, Ford fully understands that, at best, his habeas petition will lead to a new trial and a new trial, at best, will lead to life without parole. Dr. Rollins's reports and testimony, Ford's testimony, and Ford's extensive correspondence all demonstrate that Ford exhibits a basic and clear understanding of the habeas proceedings, that Ford has persisted in his opposition to further review of his conviction and death sentence, and that Ford understands without further collateral review he will be executed.

In sum, the district court correctly concluded that under *Lonchar,* Ford need not understand the particulars of each legal issue framed into the petition or the likelihood of prevailing on any or all of them. The district court's finding that Ford understands his legal position and the options available to him is

22

supported by substantial evidence in this record and is not clearly erroneous. Thus, the district court did not err in finding that Ford does not meet *Lonchar*'s second requirement for incompetency.

C.      *Lonchar's Third Prong*

Likewise, we conclude that the district court did not err in finding that Ford also did not meet *Lonchar*'s third requirement. Again, Ford's own testimony and Dr. Rollins's reports and testimony support the district court's findings that Ford has the ability to make a rational choice among his options and has done so. Specifically, there is substantial evidence in the record that Ford desires to dismiss his petition because he is weary of languishing in prison, he believes a new trial will only result at best in a conviction and life in prison, he is justly pessimistic that he will ever get out of prison, and he believes he will be happier "in his afterlife in Heaven."

Ford's testimony demonstrates how he recognizes his options and how he has rational reasons for choosing the option of execution. At the June 10, 1998 hearing, Ford stated that "he was tired of being on death row" and was ready to "be with his Creator if I can get that." The magistrate judge inquired about Ford's belief that he would be convicted again even if he got a new trial as follows:

> THE COURT: I made a note here that you told Dr. Rollins that even if you got a new trial you didn't think it would do any good. Could you tell me what you meant by that?
>
> THE PETITIONER: Well, I don't think if I got a new trial that there would still be the possibility of me going free.
>
> THE COURT: You think you would be convicted again and you would be right back where you are now?
>
> THE PETITIONER: Yeah, that's what I believe.
>
> THE COURT: And you don't want to go through with that?
>
> THE PETITIONER: No I don't wanting [sic] to go through that.

Ford also testified that "this situation has become real tiresome to me and everything. And I realize I am supposed to be punished for my crime. It feels like I've been punished long enough." During the hearing, Ford explicitly testified that "[w]aiting is a punishment, you know. It's better—it wasn't too bad five years

23

ago, you know. It was—everything was moving on right. But it don't stand still, and time and waiting is a punishment for me right now. So that's what it's [his desire to waive his habeas petition] based on, you know." Ford further testified, "time is punishment. I don't want to subject myself to it any longer just sitting and waiting on how things going to play out with the legal system."

In a subsequent August 13, 1998 phone conference with Dr. Rollins and Ford's counsel, the magistrate judge questioned Ford, "Now after Dr. Rollins talked to you again, he told me that it is still his opinion that you are mentally competent to dismiss your case and your lawyer if that's what you want to do." The judge continued, "I received a letter from you on July the 22nd ... [that] states that you want to drop your case and it states some of the reasons why." Ford responded affirmatively and once again expressed the reason for his decision—a desire to end the waiting process of death row appeals and a desire to quicken his transition to the afterlife.

In recent letters written on May 9, 1999, June 17, 1999, and August 9, 1999, Ford again, clearly and lucidly, expressed his desire to terminate his habeas petition and be executed. For example, his letter written on June 17, 1999 to his counsel states, "I will like to die so heaven will be my Home [sic] it have been a long wait I don't want to stay alive ... P.S. I don't have any fear about death so please dont [sic] file anything. I can't handle this situation and death is a way out." His letter written on August 9, 1999 to respondent's counsel, also states: "I don't need a new trail [sic]. I just want my death carry out ... this letter is for all the judges to read ... I don't need a lawyer and to have my sentence of death carry out is my aim." In addition to Ford's testimony and letters, Dr. Rollins testified and issued two reports expressly finding that Ford was able to make a rational choice among his legal options.

On appeal, Ford's counsel argues primarily (a) that Dr. Rollins did not adequately consider Ford's specific religious belief that at death he will join the "Holy Trinity" or his bizarre translation statements, such as how through translation he travels and has many wives and Swiss bank accounts, (b) that Dr. Rollins's evaluations are thus inadequate and unreliable, and (c) that therefore Dr. Rollins's opinions, and the district

24

court's findings relying thereon, are fatally flawed. These arguments lack merit because the record shows that both Dr. Rollins and the district court fully considered these subjects, that Dr. Rollins's mental evaluations of Ford were adequate and reliable, and that the district court did not err in crediting Dr. Rollins's testimony and reports in determining Ford's competency under *Lonchar* 's third prong.

Regarding Ford's religious beliefs, Dr. Rollins specifically testified that, in his professional opinion, he viewed Ford's beliefs about being part of the "Holy Trinity" to represent Ford's view that "in the afterlife that he is going to have a cherished position in heaven, that he is going to be respected, and that he is going to be comfortable and happy there." Dr. Rollins testified that Ford's religious beliefs were not delusional, but instead, what "Ford thinks will happen following his death ... [based on] his own interpretation of the Bible and his religious beliefs." According to Dr. Rollins, "when people are in difficult situations, they often have wishes that things would be different.... [W]ish fulfillment, per se, is fairly normal behavior." Dr. Rollins continued, "It is my view that [Ford's religious views represent] Mr. Ford's assessment of what will happen to him in the afterlife." According to Dr. Rollins, Ford's religious views also must be examined in light of the fact that:

> [Ford] doesn't have the educational or philosophical background ... to take more than a fairly direct interpretation of the Bible.... [H]e is a person under stress who is turning to religion for support and particularly because he doesn't have other kinds of support to him.... [C]linicians have to be very careful in characterizing religious beliefs as delusional ... an assessment of that, again has to be made in terms of the context of the whole presentation.

We agree with the district court that "Dr. Rollins's consideration of the petitioner's beliefs about an afterlife does not appear to be unreasonable or perfunctory, and it does not render Dr. Rollins's findings unreliable or unacceptable."

Similarly, the record shows that Dr. Rollins also considered fully all of Ford's "translation" related statements. Ford stated to Dr. Rollins that he had not told him previously about his translation powers, wives, travels, and bank accounts because Ford was concerned that Dr. Rollins would find him mentally ill. However, at the June 10 hearing, Davis, as counsel, asked Ford to explain his translation powers. According

25

to Ford, "translation" is the power he possesses to leave his body and travel around the world. Through translation, Ford believes he has been able to live in the third world, have 400,000 wives, and invest in businesses overseas, thus making millions which he then placed in Swiss bank accounts. Upon hearing Ford's translation statements at the hearing, Dr. Rollins requested to examine Ford again.

After the hearing, Dr. Rollins reexamined Ford and talked with a psychiatrist and psychologist who had treated Ford during his incarceration. Those medical experts advised Dr. Rollins that Ford had never talked about translation with them.[12] During the reexamination, Ford reiterated his belief in his translation powers. Dr. Rollins then filed an Addendum report in which he outlined Ford's translation statements and found that Ford's translation beliefs did not impair Ford's ability to choose rationally among his legal options in this case. According to Dr. Rollins, "Mr. Ford's ability to make decisions is not impaired ... Mr. Ford is able to communicate and interact with others. He makes decisions about his daily activities and interactions. He decides who to ask for money and how to spend his money. He would be considered competent to consent to surgery, make a will, or enter in financial transactions."

Dr. Rollins further found that Ford's statements about his translation ability and experiences also represent "fantasy or wish fulfillment" on Ford's part. Alternatively, Dr. Rollins determined that even if Ford's "translation represents impaired reality testing (i.e., psychoses), it is an isolated delusional disorder and does not impair Mr. Ford's daily functioning." Dr. Rollins expressly found that Ford's "ability to make decisions is not impaired by translation."

Ford's attorney complains that Dr. Rollins did not assign the proper significance to Ford's statements about the "Holy Trinity" and having, through translation, wives, travels, and bank accounts. However, the district court correctly found that Dr. Rollins's testimony and reports show that he did consider these factors, but that they simply did not lead him to conclude that Ford was incompetent. The district court also properly found that although Ford's counsel may disagree with the emphasis Dr. Rollins placed on certain information,

[12]*See* footnote 8 *supra.*

26

the court was satisfied, after an independent review of Dr. Rollins's reports and testimony, that Dr. Rollins considered all record information relevant to his competency opinion, that his assessment of Ford was not "unreasonable or unacceptable," and that his mental evaluation of Ford was adequate and reliable.[13]

Because there was significant evidence of other rational reasons behind Ford's decision to dismiss his habeas petition, this Court also finds that Ford's statements regarding translation and the "Holy Trinity" do not demonstrate, per se, that he is incompetent as Ford's counsel, in effect, contends, but were correctly considered and weighed with all of the other evidence by both Dr. Rollins and the district court. The arguments of Ford's counsel relate at best to the weight to be given to Dr. Rollins's competency opinions but do not show that his mental evaluations were inadequate or that his opinions are unreliable.

It is also significant that Dr. Rollins was not hired by the prosecutor, but was the court's neutral psychiatric witness selected from a list of names provided by Ford's counsel. More importantly, Dr. Rollins has extensive experience in competency evaluations, having conducted approximately 200 mental evaluations in criminal cases each year since 1972. The record also reveals that Dr. Rollins has found defendants mentally incompetent in approximately twenty-five percent of his evaluations. Furthermore, Ford has been evaluated several times in state court and found competent each time. Dr. Rollins's findings concerning Ford's mental health are similar to the findings of the previous evaluations. Given this and the totality of the evidence reviewed in detail above, we find no merit to the claims that Dr. Rollins's evaluations of Ford are inadequate or that his opinions are unreliable.

---

[13]Ford's counsel also challenged Dr. Rollins's conclusion that Ford's belief *at trial* that God would reveal himself and resurrect his murder victims was "a wish fulfillment under stress that represents impaired reality testing." Ford's counsel argued that such beliefs could only be the result of mental illness. The district court disagreed, noting that Dr. Rollins stressed that his explanation was only one possible explanation among many, but that he had not thoroughly assessed the issue, because he was charged with evaluating Ford's current competence in 1998, as opposed to Ford's competence at the time of trial in 1984. The district court found that this objection by Ford's counsel does not reveal Dr. Rollins's findings to be unreliable or unacceptable in any regard.

Ford's counsel also asserts that Dr. Rollins allowed racial stereotypes to infect his evaluation of Ford and improperly attributed certain of Ford's religious beliefs to his cultural background as an African-American rather than appropriately to mental illness. The district court accurately details Dr. Rollins's explanation about how he attempts to discern whether a stated religious belief is part of a cultural background or a mental disorder. The district court correctly observed that Dr. Rollins's comments arose only in an attempt to explain how different cultural backgrounds might affect evaluations of mental health and how those differences can be obstacles in performing an effective evaluation. The district court noted that Dr. Rollins indicated that certain of Ford's religious beliefs were held not only by African-Americans but also by Caucasians, particularly in the southeastern area of the United States. The district court found that Dr. Rollins explained why in the course of forming his opinion he had not assigned as much significance to Ford's religious beliefs as Ford's counsel thought proper. The district court found that, in the context of Dr. Rollins's complete testimony at the June 10, 1998 hearing and of his written reports, Ford's counsel had not shown that Dr. Rollins's opinion on Ford's competency to be "in any way unreliable or unacceptable." All of these findings of the district court are supported by the record and are not clearly erroneous.

Along the same lines, Ford's counsel argues that the district court, like Dr. Rollins, did not adequately consider Ford's core beliefs about his translation experiences and becoming part of the "Holy Trinity" in the afterlife. Counsel asserts that the district court incorrectly stopped its competency inquiry when it found that Ford articulated certain logical reasons for his desire to waive his appeals. We disagree. As outlined above, the record shows that the district court considered all of the evidence and all of Ford's beliefs in concluding that Ford's decision was motivated by rational reasons. The court also acknowledged Ford's mental disorders but found they did not drive Ford to make his decision to waive further appeals.[14]

[14]Ford's counsel claims that the district court erred by discussing mainly Ford's translation beliefs in its order and by not acknowledging in its order other manifestations of Ford's mental disorders, such as his statements about having 400,000 wives and millions in Swiss bank accounts. The mere fact that the district court's order only discussed certain specific statements by Ford does not provide evidence that the court did not consider all relevant record evidence in reaching its conclusion. In addition, the court refers specifically

Lastly, Ford's counsel complains that Dr. Rollins gave "short shrift" to the full picture of Ford's mental health by failing to review all available mental health records and to interview persons other than Ford. We again disagree. Dr. Rollins reviewed some twenty-five pounds of records regarding Ford's mental health. Those records included, for example, records from Ford's childhood, records from his youth, records from Taylor Hardin Secure Medical Facility, the trial transcript in this case, records from the hearing on Ford's motion to proceed pro se and his competence to stand trial, and prison records. The district court correctly noted that Dr. Rollins acknowledged that not every significant thing was included in his written reports but that he included what ultimately was most significant amongst the records he reviewed. Dr. Rollins testified that his reports included the more significant material, but that he considered a great deal more of Ford's history than was included in his reports. We agree with the district court that Dr. Rollins's testimony reflects his familiarity with information regarding Ford's background and mental health history. While Ford's counsel correctly points out that Dr. Rollins's first examination failed to uncover Ford's beliefs about translation, the evidence shows that Ford purposely had not told Dr. Rollins about his translation. Additionally, Dr. Rollins remedied this by examining Ford a second time and specifically reassessing Ford's competency in light of Ford's beliefs about his translation powers and having wives, travels, and bank accounts. After the June 10 hearing, Dr. Rollins also spoke to a prison guard and two mental health professionals who worked with Ford during his incarceration and reviewed Ford's mental health records during his incarceration.

In sum, the district court's findings under *Lonchar*'s third prong—that Ford has the ability to make rational choices among his options and has done so—are supported by substantial, reliable evidence. Thus, the district court's determination that Ford does not meet *Lonchar*'s third requirement is not clearly erroneous.

### D.     *Dr. Pincus*

to Dr. Rollins's Addendum report in which these very statements by Ford are discussed and diagnosed. The district court's order also addresses the general argument that Ford's desire to dismiss his appeal is based upon insane religious delusions which are, in effect, driving him to commit suicide. The district court expressly rejects this contention by Ford's counsel, finding that "petitioner's testimony proves otherwise."

Ford's counsel also challenges the district court's decision to reject the findings of Dr. Jonathan Pincus, who reported that Ford was incompetent. The district court considered Dr. Pincus's report but observed that Dr. Pincus assumes that Ford's motion to dismiss his petition is per se irrational. The district court found that this assumption detracts from the weight and credibility of Dr. Pincus's findings and raises doubts whether he would ever find a death row inmate competent to dismiss a habeas petition. The district court also noted that the Supreme Court essentially rejected Dr. Pincus's view when it held a death row inmate may waive his habeas petition and be executed in *Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976) (holding that death row petitioner may competently waive further review of his conviction and sentence). In light of the district court's discussion concerning Dr. Pincus's report and the evidence that Ford has rational reasons for dismissing his petition, this Court finds that the district court was not clearly erroneous in rejecting the findings of Dr. Pincus that Ford's decision is irrational and that he is incompetent.

E.      *Davis's Standing*

As outlined earlier, Ford permitted Davis as his attorney to file and litigate his § 2254 habeas petition from 1995 until 1997. Thus, as noted in our earlier opinion in this case, Davis has standing to the limited extent necessary to appeal the district court's findings that Ford is mentally competent. *Ford v. Haley,* 179 F.3d 1342, 1345-46 (11th Cir.1999).

Having ruled on the merits of this competency issue, we now examine whether Davis has standing to pursue any other issues in Ford's habeas petition. Davis has the burden to establish her standing to proceed on behalf of Ford and thereby to invoke the jurisdiction of the federal courts. *See Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Lonchar,* 978 F.2d at 640. Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases and controversies. U.S. Const. art. III, § 2, cl. 1; *see Whitmore,* 495 U.S. at 154-55, 110 S.Ct. 1717. In habeas corpus cases, courts have long permitted a next friend to proceed on behalf of a prisoner who is unable to seek relief himself. As this Court explained in *Lonchar,* "Congress expressly codified this next friend standing in 1948 by allowing for

30

application for a writ of habeas corpus 'by the person for whose relief it is intended or by someone acting in his behalf.' 28 U.S.C. § 2242 (1988)." 978 F.2d at 641. However, the Supreme Court has indicated that next friend status is not automatic, but instead the would-be next friend must first prove that the real party in interest cannot pursue his own cause due to some disability, such as mental incompetence, and must show some relationship or other evidence that demonstrates the next friend is truly dedicated to the interests of the real party in interest. *Whitmore,* 495 U.S. at 163-64, 110 S.Ct. 1717. Although *Whitmore* involved next friend standing to pursue a direct appeal, this Court held in *Lonchar* that the logic of *Whitmore* applies where a would-be next friend seeks a writ of habeas corpus on behalf of another. *Lonchar,* 978 F.2d at 637, 640.

Throughout her representation of Ford for several years, Davis has shown that she is sufficiently dedicated to the best interests of Ford. In certain circumstances, attorneys, such as Davis, who have a long history of representing a client with mental disorders may appear as "next friend" to challenge competency rulings with as much justification as a relative of a defendant. *See Lenhard v. Wolff,* 443 U.S. 1306, 1310, 100 S.Ct. 3, 61 L.Ed.2d 885 (1979) (observing that "it strikes me that from a purely technical standpoint a public defender may appear as 'next friend' with as much justification as the mother of [the defendant]"). However, because Ford is mentally competent, Davis has not shown that Ford, the real party in interest, cannot pursue his own cause. Indeed, the evidence shows just the opposite. Ford can pursue it, but has chosen not to. Therefore, once the competency issue is resolved, there is no longer any case or controversy between Ford and the respondent. Since Davis has not shown next friend status, she lacks standing to pursue any other issues in this habeas petition. Therefore, we lack jurisdiction over any other issues raised in this habeas petition.

*VII. CONCLUSION*

For the foregoing reasons, we conclude that the district court did not clearly err in its findings that Ford is competent to dismiss his § 2254 habeas petition and Davis as his counsel. Since Ford has dismissed his § 2254 habeas petition, we vacate our stay of Ford's execution entered on July 7, 1999. Because there is

31

no longer any controversy between Ford and respondent and because Davis lacks standing to pursue any other issues in this habeas petition, we dismiss this appeal for lack of jurisdiction under Article III of the United States Constitution.

AFFIRMED AND DISMISSED;  STAY VACATED.